**In re GGW BRANDS, LLC, GGW Marketing, LLC, Debtors.**

**Argyle Online, LLC, Plaintiffs,**

v.

**R. Todd Nielson, Defendant.**

**Bankruptcy No. 2:13–bk–15130–SK. Adversary No. 2:13–ap–01552–SK.**

United States Bankruptcy Court, C.D. California, Los Angeles Division.

Oct. 3, 2013.

Michael D. Kolodzi, Woodland Hills, CA, Ronald Tym, The Tym Firm, Santa Fe, NM, Ronald D. Tym, The Tym Firm, Canoga Park, CA, for Plaintiffs.

Matthew Heyn, Robert J. Pfister, Jonathan M. Weiss, Klee, Tuchin, Bogdanoff & Stern LLP, Los Angeles, CA, Brendt C. Butler, Chatsworth, CA, for Defendant and GGW Marketing, LLC.

## COURT'S TENTATIVE RULING ON "MOTION FOR PARTIAL SUMMARY JUDGEMENT" (DOCKET # 96) WHICH WAS ADOPTED AS THE COURT'S FINAL RULING AT THE HEARING

SANDRA R. KLEIN, Bankruptcy Judge.

The Court's tentative ruling issued on October 2, 2013 was adopted as the Court's final ruling following the October 3, 2013 hearing on the above-captioned motion. A copy of the tentative ruling is attached hereto.

### ATTACHMENT

**10/3/13**

Before the Court is the Chapter 11 Trustee's "Motion for Partial Summary Judgment" (MSJ). AP Docket # 96.[1] The Chapter 11 Trustee (Trustee) submitted the following documents in support of the MSJ: Separate Statement of Uncontroverted Facts and Conclusions of Law (SS), AP Docket # 100; Declaration of Matthew C. Heyn (Heyn 8/22/13 Decl.), AP

---

1. "BK Docket" refers to documents in the bankruptcy case, *In re GGW Brands, LLC,* 13–15130–SK and "AP Docket" refers to documents in the adversary proceeding, *Argyle Online, LLC v. Neilson,* 13–ap–1552–SK.

Docket # 97; Declaration of Robert J. Pfister (Pfister 8/22/13 Decl.), AP Docket # 98; and Declaration of Constan Hermano Quirong (Quirong 8/21/13 Decl.), AP Docket # 99.

On 9/12/13, Argyle Online, LLC, Path Media Holdings, LLC, Joseph R. Francis, Argyle Media Sales, LLC, and Fab Films, LLC (collectively Argyle) filed an opposition to the MSJ (Opposition). AP Docket # 116. Argyle submitted the following documents in support of the Opposition: Statement of Genuine Issues in Support of Opposition to Motion for Partial Summary Judgment (SGI), AP Docket # 117; Declaration of Christy Snow (Snow 9/11/13 Decl.), AP Docket # 118; Declaration of Christopher Dale (Dale 9/11/13 Decl.), AP Docket # 119; Declaration of Arthur Greenfield (Greenfield 9/11/13 Decl.), AP Docket # 120; and Declaration of Joseph Francis (Francis 9/11/13 Decl.), AP Docket # 121.[2]

On 9/19/13, the Trustee filed a "Reply in Further Support of Motion for Partial Summary Judgment" (Reply). AP Docket # 123. The Trustee submitted the Supplemental Declaration of Matthew C. Heyn (Heyn 9/19/13 Decl.) in support of the Reply. AP Docket # 124. And, the Trustee filed "Evidentiary Objections in Connection with Motion for Partial Summary Judgment" (Objections) to the evidence submitted by Argyle. AP Docket # 125.

Argyle and the Trustee filed additional pleadings related to the Objections. Those pleadings are discussed in the sham affidavit section of the analysis.

## I. Background

The Court finds that there is no genuine dispute as to the following facts:

### A. Procedural Background
#### 1. Girls Gone Wild Business and Trademarks

GGW Brands, LLC, GGW Direct, LLC, GGW Magazine, LLC, GGW Events, LLC (the Original GGW Debtors), and GGW Marketing, LLC (collectively with the Original GGW Debtors, the Debtors, or the GGW Entities) distribute "Girls Gone Wild" and "Guys Gone Wild" adult entertainment content through various pay-per-view outlets and directly via DVDs, websites, and a magazine. SS ¶ 1; 7/12/13 Declaration of R. Todd Neilson, BK Docket # 228 (Neilson 7/12/13 Decl.) ¶ 4. The Debtors' business depends on their ability to use intellectual property (IP) associated with the "Girls Gone Wild" and "Guys Gone Wild" brands. SS ¶ 2; 3/28/13 Declaration of Christopher Dale, BK Docket # 46 (Dale 3/28/13 Decl.) ¶¶ 3, 11 [3]; SGI ¶¶ 2 [4], 16. The IP includes the *girlsgonewild.com* and *guysgonewild.com* Internet domain names (URLs). *Id.* The IP also includes the following trademarks (Trade-

---

**2.** As discussed in the Analysis section below, the Court has determined that the vast majority of statements contained in Francis's 9/12/13 Declaration fall within the purview of the sham affidavit rule. Therefore, those statements were disregarded for the purposes of adjudicating the MSJ.

**3.** Pursuant to Federal Rule of Bankruptcy Procedure (FRBP) 7056, which incorporates Federal Rule of Civil Procedure (FRCP) 56, this Court may consider "other materials in the record." FRCP 56(c)(3); *Daniels v. Morris*, 746 F.2d 271, 276 (5th Cir.1984) ("The

judge is free to grant summary judgment on the basis of any facts shown by competent evidence in the record."); *Microsoft Corp. v. CMOS Techs., Inc.*, 872 F.Supp. 1329, 1332 n. 3 (D.N.J.1994) (same).

**4.** Paragraph 2 of the SGI indicates that this fact is "disputed" but fails to cite any evidence to support this assertion. Pursuant to FRBP 7056 and FRCP 56(c)(3) and (e)(2), the Court considers this fact undisputed for the purposes of the MSJ.

marks) listed in the "First Amended Counterclaims and Third Party Complaint to Avoid and Recover Fraudulent Transfers and for Conversion" (FACC). AP Docket # 63.

1. Banned From Television (USPTO Reg. Nos. 75939899, 7721774);
2. Girl Gone Wild (USPTO Reg. Nos. 85563745, 85563753, 85563756);
3. Girls Gone Wild (USPTO Reg. Nos. 2411851, 2894611, 4010741, 77382679, 76517377, 75640463, 77382449, 77208650);
4. Girls Gone Mobile (USPTO Reg. No. 77166100);
5. Gone Wild (USPTO Reg. Nos. 77208666, 77208674, 77384465);
6. Guys Gone Wild (USPTO Reg. No. 76427548);
7. GGW (USPTO Reg. No. 85538368); and
8. Mantra (USPTO Reg. No. 76306922).

FACC ¶ 11.

Before 11/15/11, the Trademarks and URLs were owned by GGW Brands, LLC and GGW Marketing, LLC, but all of the Debtors used the Trademarks.[5] SS ¶¶ 13, 14, 16; Quirong 8/21/13 Decl. ¶¶ 4, 9, Exs. A, C, F; 7/12/13 Declaration of Mandy Isaac, BK Docket # 228 (Isaac 7/12/13 Decl.) ¶ 7; 5/22/13 Declaration of Konrad Gatien, AP Docket # 7 (Gatien 5/22/13 Decl.) ¶¶ 4, 9, Exs. C, F; SGI ¶ 13, 14, 16 (undisputed). Although some of the Debtors are not engaged in any business activity, the Trademarks are essential to the operation of the Debtors that do transact business. SS ¶ 4; Dale 3/28/13 Decl. ¶ 3 ("The lifeline of the GGW Entities are the [Trademarks]."), ¶ 11 ("The intellectual property rights required by the GGW Entities to operate their business include the right to use the Girls Gone Wild trademarked name in connection with the website, the online videos and the pay per view videos.").[6] And, all of the Debtors "used the Trademarks as part of their adult entertainment business enterprise." SS ¶ 16; SGI ¶ 16 (undisputed).

According to Mandy Isaac, the Debtors' Controller: "[A]lthough GGW Direct, LLC, GGW Events, LLC and GGW Magazine, LLC sold 'Girls Gone Wild' products, the accounting records do not reflect any payment to, or money owed to, GGW Mar-

**5.** As discussed in detail below, GGW Marketing, LLC and GGW Brands, LLC assigned the Trademarks to Path Media Holdings, LLC in November 2011 (Assignments). The Assignments were signed by Francis as manager of GGW Marketing, LLC and as manager of GGW Brands, LLC on 11/3/11. 5/23/13 Declaration of Matthew C. Heyn (Heyn 5/23/13 Decl.), Ex. G. Records of the United States Patent Office reflect that the Assignments were executed on 11/15/11. *Id.*

**6.** Although SGI ¶ 4 indicates that this fact is disputed, the record is to the contrary. On 5/31/13, the Trustee served Argyle with the "First Set of Consolidated Discovery Requests from the Trustee to Argyle Online" (Discovery Requests). Pfister 8/22/13 Decl. ¶ 3, Ex. A. Argyle did not object to, or respond to, the Discovery Requests. *Id.* ¶ 17. Pursuant to

FRBP 7036 and FRCP 36(a)(4), matters specified in requests for admission are admitted unless the party answers or objects to the request within 30 days of being served. Request for Admission No. 2 stated, "Admit that from November 15, 2011 through the Petition Date, the ability to use the Trademarks was necessary to the ongoing business operations of the GGW Entities." Pfister 8/22/13 Decl. ¶¶ 4, 17, Ex. A. Therefore, Argyle has admitted this fact and it is not in dispute. *See Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (holding that when an opposing party's version of the facts is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment").

keting, LLC for use of the 'Girls Gone Wild' trademarks. In addition, GGW Direct, LLC, as a matter of course, paid the attorneys that represented GGW Brands, LLC, GGW Magazine, LLC, GGW Events, LLC and GGW Marketing, LLC rarely recording an intercompany account receivable for these payments." Isaac 7/12/13 Decl. ¶ 7. Christopher Dale, who testified at the 341(a) meeting of creditors for the Original GGW Debtors, admitted that there was no strict separation of GGW Brands, LLC, GGW Direct, LLC, GGW Magazine, LLC, and GGW Events, LLC.[7] 4/8/13 Transcript of Proceedings of 341(a) Meeting of the Creditors, Christopher Dale, deponent (Dale 341(a)), BK Docket # 65, 78:2–5.

Until late October/early November 2012, Joseph R. Francis (Francis) was the manager of Pablo Holdings, LLC (Pablo Holdings), which controlled the Debtors. Transcript of 4/10/13 Hearing (Trans. 4/10/13 Hearing), BK Docket # 86, 69:3–5. Pablo Holdings' Operating Agreement stated that Pablo's manager—Francis—had unfettered discretion and complete control over Pablo Holdings, which in turn controlled GGW Brands, LLC, the holding company of the other GGW Entities. *Id.*

at 69:13–18. Francis also 1) "had the ultimate say in hiring and firing GGW employees;" 2) "determined how much he would be paid, which was limited only by debtors' income," and 3) "negotiated with and terminated vendors on behalf of the GGW entities." *Id.* at 69:22–70:19. Further, "GGW funds were used to pay Francis's personal expenses [and] for lawyers who represented him personally." *Id.* at 70:2–5.

Even though Christopher Dale (Dale) was purportedly promoted to be manager of Pablo Holdings sometime in the fall of 2012, Francis continued to control the Debtors. *Id.* at 69:6–9. As an initial matter, Dale was Debtors' human resources manager until at least 8/29/12, and he conceded at that time that his "knowledge of and authority over Debtors was extremely limited." *Id.* at 72:16–19. By late October/early November 2012, Dale had been "elevated" by Asia Trust Limited, as trustee of the Ridgewood Global Trust (Ridgewood), to manage Pablo Holdings and therefore, Debtors. *Id.* at 72:20–24. Dale did not apply for this position. *Id.* at 77:17–22. Instead, Dale was notified during a telephone call with Ronald Tym (Tym)[8] that he had been "elevated."

---

7. *See also* Quirong 8/21/13 Decl. ¶¶ 2–4 (stating that as "Director of Online Operations for Girls Gone Wild," he has not drawn any distinction between the Debtors, and that all the Debtors "used and exploited" the Trademarks); Dale 3/28/13 Decl. ¶ 5 ("GGW Direct, LLC is the principal operating company for the Girls Gone Wild brand. The other GGW Entities were also formed to conduct portions of the Girls Gone Wild business. GGW Events, LLC was formed to sponsor events at which filming could take place. GGW Magazine, LLC was formed to produce a magazine covering the GGW events and young wom[e]n. GGW Brands, LLC was formed as the holding company for the other GGW Entities.")

8. It is impossible for the Court to determine who or what Tym represents at any given time because he has appeared in this case in various capacities. The evidence shows at a minimum, however, that Tym represented Francis on several matters, both before this Court and elsewhere. For example, on 2/25/13, "Tym was acting as Francis's personal counsel and also the Debtors' counsel" when Tym drafted the Termination Notice and simultaneously represented Francis in other matters. SS ¶ 49; Heyn 8/22/13 Decl. ¶¶ 4, 7, Exs. A, B; SGI ¶ 49 (undisputed). On 3/29/13, Tym filed a "Declaration of Ron Tym in Opposition to Motion for Order Directing the Appointment of a Chapter 11 Trustee," BK Docket # 44, in which he stated that he was "an attorney who represents the defendants in the California Marker Judgment Liti-

Trans. 4/10/13 Hearing at 77:17–23. Dale testified that he worked only about 4–5 hours per week for the GGW Entities while he also worked fulltime for an unrelated entity as a human resources manager. *Id.* at 73:15–16. Dale claimed to be the decision maker for the GGW Entities but he admitted "relying on the department heads to make day-to-day decisions." *Id.* at 73:18–21.

On a 5/15/12 "GGW Org Chart," Francis's title is listed as "Creative Consultant" and his name appears at the very top of the chart. 7/15/13 Declaration of Matthew C. Heyn, BK Docket # 228 (Heyn 7/15/13 Decl.) ¶ 9(c), Ex. H. Francis continued to control the GGW Entities even after Dale was appointed as Pablo Holdings' manager. Trans. 4/10/13 Hearing at 83:3–14. On 2/27/13, the date that the Original GGW Debtors filed for bankruptcy, GGW Direct, LLC paid $65,000 to Kiki Entertainment (Kiki). *Id.* at 73:23–24; 4/8/13 First Supplemental Declaration of Ronald D. Tym, Docket # 61 in *In re GGW Direct, LLC,* 13–15132–SK (Tym 4/8/13 Decl.) ¶ 5.[9] Tym claimed that PSL needed to wire funds from its account to Kiki but did not have the ability to do so. Tym 4/8/13 Decl. ¶ 5. According to Tym, "PSL asked, and GGW Direct, LLC agreed in February 2013, to forward monies from [PSL] to [Kiki]. So, [PSL] caused $65,000 of its funds on deposit at Wells Fargo to be transferred by Wells Fargo internally to Debtor, in trust, and Debtor in turn online wired those funds to [Kiki]." *Id.* Francis is the manager of PSL. Trans. 4/10/13 Hearing at 74:11–14. Even though Tym claimed that the payment to Kiki was on behalf of PSL, the evidence demonstrated

---

gation (as defined in the Motion)." The California Marker Judgment Litigation is *Wynn Las Vegas, LLC d/b/a Wynn Las Vegas v. Joseph Francis,* Case No. BS 123009, which was filed in Los Angeles County Superior Court. On 11/16/12, Wynn LV filed a Motion in the California Marker Judgment Litigation to appoint a receiver to "demand, enforce, collect, and receive all earnings by, and/or any entitlement to compensation (collectively 'earnings') earned or owed to Judgment Debtor Joseph Francis ('Francis') from any and all sources including but not limited to GGW Brands, LLC, GGW Direct, LLC, GGW Events, LLC and GGW Magazine, LLC." BK Docket # 30, Ex. F. On 4/24/13, Tym appeared on behalf of Perfect Science Labs, LLC (PSL) and Argyle Online, LLC (Argyle) during a hearing on the Trustee's "Emergency Motion for a Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue Against Joe Francis" (Francis TRO Motion) in *Neilson v. Francis.* 13–1468–SK. Tym stated that he represented PSL and Argyle only and that he did not represent Francis. On 4/25/13, in an email exchange between Tym and Francis, Tym told Francis, "I am trying to look out for the business of Argyle and PSL, which ultimately is the same as looking out for you if you are directly or indirectly a beneficiary of the Hammersmith Trust.... [I]f you feel strongly that I should be replaced, I will also feel obligated to withdraw as counsel in the other matters for you since it will all signify a breakdown in your confidence in me." Heyn 8/22/13 Decl. ¶ 4, Ex. A. On 5/14/13, Tym filed a Declaration in support of PSL, Argyle, and Francis's "Opposition to Motion for Authority to Revoke Cancellation and to File Voluntary Petition for Debtors' Subsidiary" (Tym 5/14/13 Decl.). BK Docket # 137. In the Tym 5/14/13 Decl., Tym stated that "I am a custodian of certain business records of GGW Marketing, LLC." During Tym's 5/24/13 Deposition, he stated that on 2/26/13, he was representing Argyle, PSL, and GGW. Heyn 8/22/13 Decl. ¶ 13, Ex. D at 65:11–12. On 7/23/13, Tym signed the "Notice of Dismissal Pursuant to Federal Rules of Civil Procedure 41(a) or (c) and FRBP 7041" on behalf of Argyle above the "Signature of Attorney/Party." AP Docket # 70.

**9.** Although the Court stated during the 4/10/13 Hearing that the transfer to Kiki occurred on 2/7/13, it actually occurred on 2/27/13. *See In re GGW Direct, LLC,* 13–15132–SK, Docket # 61.

that Argyle, rather than PSL, transferred the $65,000 into GGW Direct, LLC's account on 2/27/13. *Id.* at 74:14–19. And, until the Trustee was appointed, Francis—through his control of Path Media, LLC (Path Media) [10] and the Trademarks—exercised complete control over the Debtors. Trans. 4/10/13 Hearing at 82:17–21.

### 2. Assignments of the Trademarks

In October 2011, Francis hired Robert Klueger (Klueger), an attorney who specializes in asset protection. SS ¶ 18; Heyn 7/15/13 Decl. ¶ 7, Ex. J at 3:22 and 5:5–12; SGI ¶ 18 (undisputed). Klueger's 10/4/11 retention letter (Retention Letter), which was addressed to Francis, at GGW Brands, LLC, stated that:

> This letter, when executed by yourself in the space provided below, will constitute our agreement relative to the legal services that we will provide on your behalf, and the legal fees that we will earn therefor.
>
> Upon your consent, we will take the following actions, all of which will be done within 45 days of our being engaged, provided that all documentation is provided to us in a timely manner. We will return all fees if this guaranty is breached.
>
> 1. We will review all of the corporate documentation of ... GGW Brands, LLC, GGW Direct, LLC, GGW Events, LLC, GGW Magazine, LLC ..., and any related entities.... We will also review the foreign trust that was already drafted.
>
> 2. We will form one or more offshore entities. One of the offshore entities will be formed for the purpose of acting as the holder of your IP, including, copyrights, trademarks, URL's, scripts, source codes, etc. The other offshore entity or entities will act as holding companies, for the purpose of insulating your ownership.
>
> 3. We will form a foreign trust in a jurisdiction that is friendly to you and hostile to your creditors. The foreign trust will own the offshore entities. We recommend the Cook Islands, Mr. Joe Francis which has an excellent trust law. We also recommend the AsiaCiti Trust, with whom we have worked for many years.
>
> 4. We will transfer the intellectual property to the newly-created foreign entity.
>
> . . .
>
> 7. In everything that we do, we will assure that any and all corporate reorganizations that we undertake is explainable by you as legitimate corporate planning and legal tax planning.
>
> We will bill our time for all of the foregoing at the rate of $450.00 per hour. We require a retainer of $20,000, to cover the first 44.5 hours expended on your behalf. We will send out our statements on the first day of each month for the time expended during the prior month.
>
> We also require an additional $10,000, which we will remit to Marks & Devine once they are engaged. Our engagement does not commence until this engagement letter and our retainer is received.[11]

---

**10.** Path Media, LLC and Path Media Holdings, LLC are referred to collectively as Path Media. Francis signed Path Media Holdings, LLC's 10/18/11 Operating Agreement as the manager and a 10/12/11 Department of Treasury "Entity Classification Election," Form 8832, indicates that Francis is the owner of Path Media. Heyn 5/23/13 Decl. ¶¶ 8, 9, Exs. E, F.

**11.** This entire paragraph was crossed out and initialed by Francis.

If the foregoing meets your consent, please sign this letter in the space provided below, and return it to us, together with your check in the amount of $30,000. Alternatively, our wire transfer instructions are attached.

Thank you for the trust and confidence you will place in this office.

AGREED AND ACCEPTED:

/s/

Joe Francis

SS ¶ 19; Heyn 7/15/13 Decl. ¶ 8, Ex. I; Heyn 9/19/13 Decl. ¶ 11, Ex. D.[13]

**12.** Any argument that the Court should not consider the Retention Letter because it was submitted for the first time with the Reply would fail. The Retention Letter was included in the exhibits submitted with the MSJ. MSJ at 5:15; SS ¶ 19; Heyn 7/15/13 Decl. ¶ 8, Ex. I. There is a slight difference between the version submitted with the MSJ and the version submitted with the Reply; the Retention Letter submitted with the MSJ was not signed by Francis, but the version submitted with the Reply was. Otherwise, the letters are identical.

**13.** Argyle contends the Retention Letter is inadmissible because it is protected by the attorney-client privilege. SGI ¶ 19. As the party asserting the attorney-client privilege, Argyle has the burden of establishing that the attorney-client privilege applies. *Clarke v. Am. Commerce Nat. Bank,* 974 F.2d 127, 129 (9th Cir.1992). Argyle has not met its burden. First, the attorney-client privilege does not apply to retention letters. *See Clarke,* 974 F.2d at 129 (stating "the identity of the client" and "the general purpose of the work performed" are "usually not protected from disclosure by the attorney-client privilege"). Second, it appears that the attorney-client privilege would not protect the Retention Letter because of the crime-fraud exception to the attorney-client privilege rule. Communications between an attorney and client are not protected if they are part of a fraudulent scheme to conceal assets from creditors. *United States v. Ballard,* 779 F.2d 287, 293 (5th Cir.1986). There is evidence on the rec-

Klueger testified that none of his work was undertaken for tax planning purposes, but rather, to make it "more difficult for a creditor to be able to access the assets" and so that no "creditor of the operating company [could] seize the intellectual property." SS ¶¶ 23, 25; Heyn 5/23/13 Decl. ¶ 7, Ex. J at 7:14–18 and 9:17–18. Klueger formed Path Media, a Nevis entity, in October 2011. SS ¶¶ 24, 25; Heyn 7/15/13 Decl. ¶ 7, Ex. J at 9:23 and 10:5–6; SGI ¶¶ 24, 25. According to Klueger, his approach to asset protection "is part science and part art" and forming Path Media in Nevis made it "[j]ust more difficult for a creditor to be able to access the assets." SS ¶ 25; Heyn 7/15/13 Decl. ¶ 7, Ex. J at 9:12–18.[14]

ord demonstrating that: 1) Francis controlled Path Media, 2) GGW Marketing, LLC and GGW Brands, LLC received no consideration as part of the Assignments, 3) the Trademarks were GGW Marketing, LLC's most valuable asset, and 4) there were several pending or threatened lawsuits against GGW Marketing, LLC at the time of the Assignments. *See In re Andrews,* 186 B.R. 219, 222 (Bankr.E.D.Virg. 1995) (listing "indicia" of fraud under § 727(a)(2)(A), and using the indicia to determine requisite intent for crime-fraud exception). Finally, on 5/9/13, the Court issued an order granting the Trustee's "Emergency Motion ... to Allow the Trustee to Review Emails Stored on the Debtors' Computers" (Email Motion), which authorized the Trustee to review emails of four "high level managers and key executives of the Debtors" including Francis. BK Docket # 112. During the hearing on the Email Motion, the Court found that based on the analysis and four-part test set forth in *In re Asia Global Crossing, Ltd.,* 322 B.R. 247, 257 (Bankr.S.D.N.Y.2005), Francis did not have any reasonable expectation of privacy in emails sent and received from Debtors' computers. The Trustee found the signed Retention Letter in Francis's email.

**14.** Although Argyle objects to the admissibility of Klueger's testimony and claims that it is "mischaracterized," Argyle has not explained or submitted any evidence substantiating this contention. SGI ¶¶ 23, 25. Accordingly, this Court considers Klueger's testimony to be undisputed. FRBP 7056; FRCP 56(c)(3) and

On 11/15/11, GGW Marketing, LLC and GGW Brands, LLC assigned the Trademarks to Path Media (Assignments). SS ¶¶ 20, 21; Heyn 5/23/13 Decl. ¶ 10, Ex G at 2–9; Gatien 5/22/13 Decl. ¶ 9, Ex. F at 9–14; SGI ¶¶ 20, 21 (undisputed).[15] Klueger prepared the assignment documents. SS ¶ 22; Heyn 7/15/13 Decl. ¶ 7, Ex. J at 10:7–13; SGI ¶ 22 (undisputed). At the time of the Assignments, Path Media was owned by Ridgewood. SS ¶ 28; Heyn 5/23/13 Decl. ¶ 8, Ex. E; SGI ¶ 28 (undisputed). Klueger created Ridgewood and Francis was the principal and a beneficiary of Ridgewood. SS ¶¶ 29–31; Heyn 8/22/13 Decl. ¶ 14, Ex. E at 26:8–9; Heyn 5/23/13 Decl. ¶ 23, Ex. T; SGI ¶ 29–31,[16] Francis managed and controlled Path Media and he continues to do so. SS ¶¶ 26, 27, 32; Heyn 5/23/13 Decl. ¶ 8, Ex. E; Heyn 8/22/13 Decl. ¶ 14, Ex. E at 14:25–15:6 and 30:3–7; Trans. 4/10/13 Hearing at 79:16–18 ("all of the interrelated companies are somehow related to Francis and controlled by him"), 82:17–19 ("Through his control of Path Media and its exceedingly valuable IP rights, Francis exercises complete control over debtors.").

The Debtors did not receive any consideration for the Assignments. SS ¶ 34; Heyn 5/23/13 Decl. ¶ 25, Ex. V at 11:5–22; Gatien 5/22/13 Decl. ¶ 11; SGI ¶ 34 (undisputed). After the Assignments, the Debtors continued to use the Trademarks without paying any fees or royalties to Path Media. SS ¶ 35; Gatien 5/22/13 Decl. ¶ 7; Pfister 8/22/13 Decl. ¶ 17, Ex. A at 8:8–10.[17] The Debtors also continued to maintain the Trademarks by paying registration fees and making payments to attorneys for Path Media. SS ¶ 36; Gatien 5/22/13 Decl. ¶ 13, Exs. H, I; SGI ¶ 36 (undisputed).

At the time of the Assignments, the following lawsuits were pending or threatened against the Debtors:[18]

1. *Etagz, Inc. v. Conrey Publications, Inc., et al.,* Case No. 2:10–cv–01266 (D. Utah, filed 12/22/10);

2. *Creditors Adjustment Bureau, Inc. v. Mantra Films, Inc., et al.,* Case

---

(e)(2). Further, Klueger's statements are taken verbatim from his deposition.

**15.** SS ¶ 21 states that "On [11/21/11] GGW Brands transferred the remaining Trademarks (including the URLs) to Path Media." SGI ¶ 21 disputes this fact solely on the basis that the URLs utilized by the Original GGW Debtors "were never owned by any of those entities. They were owned by GGW Marketing, LLC and then transferred by GGW marketing, LLC to Path Media in 2011 when the trademarks were transferred." The evidence cited by Argyle to support this assertion is ¶ 21 of the Francis 9/11/13 Decl. As discussed below, this paragraph of the Francis 9/11/13 Decl. falls within the purview of the "sham affidavit" rule and is not being considered. Regardless, any such dispute regarding which entity originally owned the URLs is irrelevant because the counts related to the transfer of the Trademarks are brought on behalf of both GGW Brands, LLC and GGW Marketing, LLC. Further, as discussed below, the Court has determined that all of the Debtors were part of a single business enterprise.

**16.** The SGI disputes this assertion solely on the basis that Francis was not the *only* beneficiary of Ridgewood. SGI ¶ 31.

**17.** Request for Admission No. 3 stated, "Admit that after the Assignments, the GGW Entities continued to use the Trademarks in the same manner in which they had used the Trademarks prior to the Assignments." Because Argyle neither objected to, nor responded to, the Discovery Requests, this fact is admitted and is not in dispute. Pfister 8/22/13 Decl. ¶¶ 4, 17, Ex. A.

**18.** Although Argyle contends that there were no lawsuits threatened at the time of the Assignments, the only evidence substantiating this assertion is ¶ 13 of the Francis 9/11/13 Decl., which as discussed below, is not being considered.

No. SC113754 (Los Angeles Sup.Ct., filed 8/11/11) [19];

3. *Rayment v. GGW Brands, LLC, et al.*, Case No. CJ–2012–01321 (Tulsa Cnty., Okla. Dist. Ct., filed 3/12/12);

4. *Favazza v. Path Media Holdings, LLC, et. al.*, Case No. 4:12–cv–01561 (E.D. Mo., filed 8/29/12).[20]

SS ¶ 33; Heyn 5/23/13 Decl. ¶¶ 17–19, Exs. N, O, P.

3. Cancellation of GGW Marketing, LLC

On 5/4/12, Francis and Klueger filed a Certificate of Cancellation in Delaware for GGW Marketing, LLC. SS ¶ 37; Heyn 5/23/13 Decl. ¶ 11, Ex. H; SGI ¶ 37 (undisputed). On 1/16/13, Dale, as "Manager of GGW Brands, LLC its Manager," filed a Limited Liability Certification of Cancellation for GGW Marketing, LLC in California. Heyn 5/23/13 Decl. ¶ 12, Ex. I.

4. Termination of the Trademarks and the License Agreement

On 2/25/13, Path Media sent a "Notice of Termination of Licenses" to Debtors terminating their right to use the Trademarks (Termination Notice). SS ¶ 47; Heyn 5/23/13 Decl. ¶ 13, Ex. J; SGI ¶ 47 (undisputed). Tym assisted in the preparation of the Termination Notice. SS ¶ 48; Heyn 8/22/13 Decl. ¶¶ 7, 8, Ex. B; SGI ¶ 48 (undisputed). At that time, Tym represented Francis and the Debtors. SS ¶ 49; Heyn 8/22/13 Decl. ¶ 4, Ex. A; SGI ¶ 49 (undisputed).

On 2/26/13,[21] Tym forwarded a draft of the Termination Notice to the Cook Islands Trustee, stating in the cover email: "It is my understanding that Asiaciti Pacif-

---

**19.** The Trustee did not provide evidence this lawsuit was pending against Debtors at the time of the Assignments. Pursuant to Federal Rule of Evidence (FRE) 201(b)(2) and (c)(1), this Court takes judicial notice of the fact that on 8/11/11, *Creditors Adjustment Bureau, Inc. v. Mantra Films, Inc., et al.*, Case No. SC113754, was filed in Los Angeles Superior Court. *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir.1980) ("a court may take judicial notice of . . . the records of [a] court in other cases").

**20.** The MSJ and SS indicate this case was filed in the Eastern District of Missouri on 8/29/12, case no. 4:12–cv–01561. MSJ at 6; SS ¶ 33. The evidence submitted in support of the SS reveals the case was filed on 7/6/12 in the Missouri Circuit Court, case no. 1222–CC09045 (State Case). Heyn 5/23/13 Decl. ¶ 19, Ex. P. Evidence previously submitted in this case demonstrates the State Case was removed to the Eastern District of Missouri on 8/29/12. 5/9/13 Declaration of Matthew C. Heyn, BK Docket # 121 (Heyn 5/9/13 Decl.) ¶ 10, Ex. E.

**21.** The Trustee highlights that the Termination Notice was dated 2/25/13, but the email and draft Termination Notice that Tym forwarded to the Cook Island Trustee were dated 2/26/13. MSJ at 7 n.2. Further, Tym's email requested that the terminations be executed and emailed back to him by "tomorrow (Tuesday)." Pursuant to FRE 201, the Court takes judicial notice that 2/26/13 was a Tuesday. The Original GGW Debtors' bankruptcy cases were filed on Wednesday, 2/27/13. Therefore, it appears that the Termination Notice was actually signed no earlier than one day before the Original GGW Debtors filed for bankruptcy. The Trustee notes that if the Termination Notice was signed after the Original GGW Debtors filed for bankruptcy, it would be void as a violation of the automatic stay and would be an unauthorized postpetition transfer pursuant to 11 U.S.C. § 549(a). Because there is no evidence demonstrating that the Termination Notice was executed postpetition, and because the Court must construe the facts in the light most favorable to Argyle when adjudicating the MSJ, *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Court assumes that it was executed prepetition. For the purposes of this analysis, it does not matter whether the Termination Notice was signed on 2/25/13 or 2/26/13.

ic Trust is manager of Path Media Holdings, LLC (which is 100% owned by Ridgewood Global Trust). In that regard, I ask that the following termination of licenses be executed and emailed to me by tomorrow (Tuesday) morning if possible." SS ¶ 50; Heyn 8/22/13 Decl. ¶¶ 7, 8, Ex. B; SGI ¶ 50 (undisputed). The draft Termination Notice attached to the email is exactly the same as the Termination Notice signed by the Cook Islands Trustee. *Compare* Heyn 5/23/13 Decl. ¶ 13, Ex. J *with* Heyn 8/22/13 Decl. ¶¶ 7, 8, Ex. B. On 2/26/13, Tym also sent an email to Francis stating "[t]he IP license agreement will not be between Path Media and Pablo because we do not want the GGW entities to have access to those licenses. The license agreement will be between Path Media and Argyle. I have had Path Media (Asiaciti) terminate all licenses that were held by [sic] GGW entities." Heyn 5/23/13 Decl. ¶ 5, Ex. B.

The Termination Notice was addressed to GGW Brands, LLC, GGW Direct, LLC, GGW Events, LLC, GGW Magazine, LLC, and GGW Marketing, LLC.[22] SS ¶ 52; Heyn 5/23/13 Decl. ¶ 13, Ex. J; SGI ¶ 52 (undisputed). These entities were collectively referred to in the Termination Notice as the "GGW Entities." *Id.* The Termination Notice stated "all oral and written license agreements with [Debtors] for use of the IP Property are terminated,"[23] and the Debtors "may no longer

produce, sell or make use of products or services using such IP Property." SS ¶ 51; Heyn 5/23/13 Decl. ¶ 13, Ex. J; SGI ¶ 51 (undisputed). The Termination Notice did not draw any distinction between the Debtors regarding their ability to use the Trademarks. SS ¶ 53; Heyn 5/23/13 Decl. ¶ 13, Ex. J; SGI ¶ 53 (undisputed).[24]

On 2/25/13—the same date Path Media purportedly sent the Termination Notice to Debtors—Path Media (through its "U.S. Representative Argyle Online, LLC") and GGW Direct, LLC entered into a "Trademark License Agreement" (License Agreement) for use of the Trademarks. SS ¶ 54; Heyn 5/23/13 Decl. ¶ 14, Ex. K; SGI ¶ 54 (undisputed). The License Agreement allowed GGW Direct, LLC to assign its right to use the Trademarks "to a subsidiary, successor-in-interest, or affiliate of [GGW Direct, LLC]." SS ¶ 56; Heyn 5/23/13 Decl. ¶ 14, Ex. K at ¶ 8(I); SGI ¶ 56 (undisputed).

Tym received the Termination Notice and License Agreement (collectively Termination/Re–License) at the same time. Heyn 8/22/13 Decl. ¶ 13, Ex. D (Tym 5/24/13 Depo) at 71:24–25. According to Tym, Path Media, which was previously part of Ridgewood (of which Francis is a principal and beneficiary), was transferred to the Hammersmith Trust, and that was why the License Agreement "was with Path Media Holdings and the Hammersmith Trust." *Id.* at 71:24–72:11.

---

**22.** The Court notes that GGW Marketing, LLC was purportedly cancelled on 5/4/12 in Delaware and on 1/16/13 in California. Heyn 5/23/13 Decl. ¶¶ 11, 12, Exs. H, I.

**23.** The Termination Notice defined the IP Property as the trademark "Girls Gone Wild," USPTO Reg. No. 2894611, the trademark "Girls Gone Wild," USPTO Reg. No. 4010741 and an application for a trademark "GGW" USPTO Serial Number 85538368. Heyn 5/23/13 Decl. ¶ 13, Ex. J.

**24.** The FACC alleged "all facets of the purported termination were directed to all of the Debtors, and no distinction was drawn between or among entities." FACC ¶ 26. The counterclaim defendants admitted "the allegations contained in paragraph 26." Answer to First Amended Counterclaims and Third Party Complaint, AP Docket # 84 (Answer) ¶ 3.

For the first time, the License Agreement charged Debtors a $274,250.52 fee (Fee) to use the Trademarks through 5/31/13. SS ¶ 57; Heyn 5/23/13 Decl. ¶ 14, Ex. K at ¶ 1(d); SGI ¶ 57 (undisputed). This fee was paid by GGW Direct, LLC to Argyle in three separate transactions listed below. SS ¶ 59; GGW Direct, LLC Statement of Financial Affairs, Case No. 2:13–bk–15132, Docket # 22 (GGW Direct SoFA), Attachment 3b; SGI ¶ 59 (undisputed).[25]

| Date | Amount Transferred |
| --- | --- |
| 2/19/2013 | $209,250.52 |
| 2/19/2013 | $ 5,000.00 |
| 2/25/2013 | $ 60,000.00 |

The Original GGW Debtors had combined assets of $7,211,878.96, combined liabilities of $66,190,850.61, and $1,963 in their checking accounts on 3/13/13, the day they filed their bankruptcy schedules. SS ¶ 58; GGW Brands, LLC Schedules of Assets and Liabilities, BK Docket # 23 ($200 in checking account); GGW Direct, LLC Schedules of Assets and Liabilities, Case No. 2:13–bk–15132, Docket # 20 ($0 in checking account); GGW Events, LLC Schedules of Assets and Liabilities, Case No. 2:13–bk–15134, Docket # 22 ($1,563 in checking account); GGW Magazine, LLC Schedules of Assets and Liabilities, Case No. 2:13–bk–15137, Docket # 21 ($200 in checking account). GGW Direct, LLC listed assets of $3,080,112.96 and liabilities of $17,719,828.91 and GGW Marketing, LLC listed assets of $0 and liabilities of $5,812,588.00. GGW Direct, LLC, Schedule B, Case No. 13–bk–15132–SK, Docket # 20; GGW Marketing, LLC Schedule B, Case No. 13–bk–23452–SK, Docket # 19.

The Debtors did not receive any consideration in connection with the Termination/Re–License.[26] SS ¶ 61; Heyn 5/23/13 Decl. ¶ 14, Exs. J, K; SGI ¶ 61. According to Tym, the License Agreement was intended to last for the initial term—through 5/31/13—and would be renewed only after Asiaciti Trust, the trustee for

---

**25.** The License Agreement is internally inconsistent. Although it indicates that its effective date was 2/25/13, it also states that the consideration of $274,250.52 had already been paid to Argyle, who is identified as Path Media's "U.S. Representative." Heyn 5/23/13 Decl., Ex. K.

**26.** " '[W]here a transfer is only a step in a general plan, the plan "must be viewed as a whole...." ' " *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir.1993) (quoting *Pereira v. Checkmate Commc'ns Co. (In re Checkmate Stereo & Elec., Ltd.)*, 9 B.R. 585, 612 (Bankr. E.D.N.Y.1981)). "[A] court should consider the overall financial consequences these transactions have on the creditors." *In re Mervyn's Holdings, LLC*, 426 B.R. 488, 497 (Bankr.D.Del.2010). "If ... there is evidence that the parties knew or should have known that the transaction would deplete the assets of the company, the Court should look beyond the formal structure." *In re Bay Plastics, Inc.*, 187 B.R. 315, 329 (Bankr.C.D.Cal.1995) (collapsing a series of transactions in an LBO into one integrated transaction). The evidence demonstrates the Termination Notice and License Agreement were part of a single, integrated scheme. Specifically, the evidence shows the Termination Notice and License Agreement would not have occurred on their own, but rather, depended on the occurrence of each other. *In re National Forge*, 344 B.R. 340, 350 (W.D.Penn.2006). Further, the proximity of the Termination/Re–License to the Original GGW Debtors' bankruptcy filings, as well as the fact that all or the bulk of the payments under the License Agreement were made before the Termination Notice was sent to the Debtors, demonstrate Path Media was well aware of the entire scheme. *In re Sunbeam Corp.*, 284 B.R. 355, 370–71 (Bankr.S.D.N.Y.2002). Last, the combined effect of the Termination/Re–License was to deplete the Original GGW Debtors' bank accounts immediately before they filed bankruptcy. *In re Bay Plastics, Inc.*, 187 B.R. at 329. Accordingly, the Court considers the Termination/Re–License to be a single transaction.

Path Media, through its U.S. Representative, Argyle, saw "what life was like dealing with somebody in bankruptcy." SS ¶ 64; Heyn 8/22/13 Decl. ¶ 13, Ex. D at 71:2–22; SGI ¶ 64 (undisputed); Heyn 5/23/13 Decl. ¶ 14, Ex. K. Regarding the Termination/Re–License, Tym explained that he did not "want to tie [the intellectual property] up in the bankruptcy." SS ¶ 63–64; SGI ¶ 63–64 (undisputed).

At time of the Termination/Re–License, in addition to the pending lawsuits listed above, three of the Debtors (GGW Direct, LLC, GGW Brands, LLC, and GGW Events, LLC) were defendants in a Nevada state court action, *Wynn Las Vegas LLC d/b/a Wynn Las Vegas v. GGW Direct, LLC et. al.*, Case No. A–12–66028–B (filed 4/18/12) (Nevada Case). SS ¶ 62; Heyn 5/23/13 Decl. ¶ 6, Ex. C; SGI ¶ 62 (undisputed). In the Nevada Case, the Nevada state court found that the plaintiff, Wynn Las Vegas (Wynn LV) demonstrated a "substantial likelihood of prevailing on the merits" on the claim that the Debtors were the "alter ego" of Francis. *Id.*

### 5. Diversion of Royalties

Francis also indirectly owns and controls Argyle Online and Argyle Media Sales (collectively Argyle). SS ¶¶ 65, 66; Heyn 8/22/13 Decl. ¶¶ 4, 6, 15, Exs. A, F. Argyle is Path Media's "U.S. Representative," with the power to enter into agreements and sue on behalf of Path Media. SS ¶ 67; Heyn 5/23/13 Decl. ¶ 14, Ex. K;SGI ¶ 67 (undisputed). Francis's girlfriend, Abbey Wilson (Wilson), is the manager of Argyle. SS ¶ 68; Heyn 5/9/13 Decl. ¶ 20, Ex. P; SGI ¶ 68 (undisputed). In May 2013, Wilson replaced Tym as manager of Argyle. *Id.*

Following the Termination/Re–License, Francis and Path Media instructed distributors to pay royalties relating to the Trademarks to Argyle rather than the Debtors. Heyn 5/23/13 Decl. ¶ 26, Ex. W (3/21/13 email sent from GGW Brands, LLC's national sales manager to a Deluxe Distributors accounts payable representative stating "this is to inform you that all Girls Gone Wild and Guys Gone Wild retail products are now being sold under Argyle Online, LLC. Please make note of the company information below for billing purposes and be sure to update your database."). One distributor, iN DEMAND, LLC, filed an Interpleader Complaint alleging that it had been advised by an Argyle representative that it would need to make payments to a new address and that Debtors' representative had asked it to send payment elsewhere. *iN DEMAND LLC v. Argyle Media Sales, LLC, et. al.*, 2:13–ap–01547–SK, Docket # 1.

On 2/25/13, Francis directed the Debtors' payment processor, Century Bankcard Services, to re-direct payments from the Debtors to Argyle. SS ¶ 70; Heyn 5/23/13 Decl. ¶ 4, Ex. A; SGI ¶ 70 (undisputed). Francis's email to the payment processor stated that "[GGW] is going away soon." SS ¶ 71; Heyn 5/23/13 Decl. ¶ 4, Ex. A; SGI ¶ 71 (undisputed). A follow-up email from Tym to Francis stated:

> I am really concerned that this switchover is not going to get done before the bk filing tomorrow, which could really leave Argyle in a bind. Gina and the others really seem to be either dragging their heels or back-tracking. I do not understand why they cannot understand that the business is staying the same, and GGW is not really shutting down, it is just that a significant portion of the business is going to Argyle for corporate restructuring purposes.

*Id.*

### B. Bankruptcy Cases

On 2/27/13, the Original GGW Debtors filed chapter 11 bankruptcy cases. SS

¶ 39; SGI ¶ 39 (undisputed). On 3/21/13, Wynn LV filed a "Motion for Order Directing the Appointment of a Chapter 11 Trustee," in each of the Original GGW Debtors' cases (Motions for Trustee). BK Docket # 28.[27] On 3/21/13, Wynn LV also filed an "Application for Order Shortening Time for Notice of Hearing on Motion for Order Directing the Appointment of a Chapter 11 Trustee" (Application) and a request for Judicial Notice. BK Docket # s 29, 30. On 3/22/13, the Court granted the Application, set a briefing schedule, and set the Motions for hearing on 4/10/13 (4/10/13 Hearing). BK Docket # 32. On 3/29/13, each Debtor filed an opposition (Opposition to Trustee or Oppositions to Trustee) to the respective Motions for Trustee, BK docket # 43, and on 4/4/13, Wynn LV filed a reply to each Opposition (Reply to Trustee or Replies to Trustee). BK Docket # 53. Debtors and Wynn LV also filed numerous evidentiary objections. BK Docket # s 47, 54, 55, and 56.

During the 4/10/13 Hearing, Wynn LV, the Original GGW Debtors, and the United States Trustee were each given an opportunity to be heard. Trans. 4/10/13 Hearing at 1:6–19. At the conclusion of the 4/10/13 Hearing, the Court granted Wynn LV's Motion for Trustee pursuant to 11 U.S.C. § 1104(a)(1) and 1104(a)(2). *Id.* at 59:18–20. On 4/12/13, R. Todd Neilson was appointed the Trustee in the Original GGW Cases. BK Docket # 82.

### 1. Revocation Motion

On 5/9/13, the Trustee filed a "Motion for Authority to Revoke Cancellation and to File Voluntarily Chapter 11 Petition for Debtors' Subsidiary," in which the Trustee sought authority to revoke the cancellation of GGW Marketing, LLC, to file a chapter 11 petition on behalf GGW Marketing, LLC, and to file an adversary proceeding to avoid the transfer of the Trademarks from GGW Marketing, LLC to Path Media (Revocation Motion). BK Docket # 120. PSL, Argyle, and Francis (collectively Francis) filed an "Opposition to Motion for Authority to Revoke Cancellation and to File Voluntary Chapter 11 Petition for GGW Marketing, LLC" (Revocation Opposition). BK Docket # 141. The only issue raised in the Revocation Opposition was whether GGW Brands, LLC was a member or a manager of GGW Marketing, LLC. *Id.* According to Francis, GGW Brands, LLC was only a manager of GGW Marketing, LLC and therefore, it never owned the Trademarks and the Trustee did not have authority to revoke GGW Marketing, LLC's cancellation and to file a bankruptcy case on behalf of GGW Marketing, LLC. *Id.* Francis acknowledged that if GGW Brands, LLC were a member of GGW Marketing, LLC, it would have an ownership interest in the Trademarks that GGW Marketing, LLC transferred to Path Media in November 2011. *Id.*

The Revocation Motion came on for hearing on 5/20/13 (5/20/13 Hearing). Counsel for the Trustee and counsel for Francis made appearances at the 5/20/13 Hearing and were given an opportunity to be heard.[28] Trans. 5/20/13 Hearing at 1:6–12.

At the conclusion of the 5/20/13 Hearing, the Court found that GGW Brands, LLC was a member of GGW Marketing, LLC.

---

**27.** Unless otherwise indicated, the docket numbers cited correspond to the documents filed in *In re GGW Brands, LLC,* 13–15130–SK. Other than the captions, the Motions, Oppositions, and Replies filed in each of the Original GGW Debtors' cases were identical.

**28.** During the 5/20/13 Hearing, Francis's counsel conceded that Argyle and PSL did not have standing to oppose the Revocation Motion. BK Docket # 183, Trans. 5/20/13 Hearing at 31:15–16.

*Id.* at 49:4–5. Alternatively, the Court found that even if GGW Brands, LLC were only a manager of GGW Marketing, LLC, based on the express language of the 11/2/06 GGW Marketing, LLC operating agreement, GGW Brands, LLC would still have the authority to revoke GGW Marketing, LLC's cancellation and to file a bankruptcy case on its behalf. *Id.* at 49:8–22.

On 5/20/13, the Court entered an "Order Authorizing the Chapter 11 Trustee to Revoke Cancellation and to File Voluntary Petition for GGW Marketing, LLC" (Revocation Order). BK Docket # 153. On 5/22/13, the Trustee filed a chapter 11 case on behalf of GGW Marketing, LLC. *In re GGW Marketing, LLC,* 13–bk–23452–SK, Docket # 1.

### a. Motion for Stay Pending Appeal of the Revocation Order

On 5/22/13, Francis filed an "Emergency Motion . . . for Stay Pending Appeal" (Stay Motion). BK Docket # 166. On 5/23/13, The Trustee filed an Opposition to the Stay Motion. BK Docket # 171. On that same date, the Court set the hearing on the Stay Motion on 5/24/13 (5/24/13 Hearing). BK Docket # 174. On 5/23/13, the Court also entered an order granting GGW Marketing, LLC's Motion for Joint Administration. BK Docket # 172–1. All of the Debtors' cases are being jointly administered under *In re GGW Brands, LLC,* 13–bk–15130. BK Docket # 172.

Before the 5/24/13 Hearing, the Court issued a tentative ruling in which it denied the Stay Motion. BK Docket # 176. During the 5/24/13 Hearing, Francis's counsel submitted on the tentative ruling. At the conclusion of the 5/24/13 Hearing, the Court adopted its tentative ruling as its final ruling. *Id.*

### b. Appeal of Revocation Order

On 6/3/13, Francis filed a "Notice of Appeal" of the Revocation Order (First NOA), which was blank. BK Docket # 178. On that same date, Francis filed a second "Notice of Appeal," which indicated that Francis was appealing the Revocation Order (Second NOA). BK Docket # 181. On 6/11/13, the United States District Court issued a "Notice Regarding Appeal from Bankruptcy Court" (Third NOA). BK Docket # 200. The Third NOA indicated that: 1) one of the parties had requested that the appeal be heard by the United States District Court for the Central District of California; 2) the appeal had been assigned to District Court Judge Fernando M. Olguin; and 3) the District Court case number was CV13–4162–FMO (Appeal). *Id.* On 7/2/13, the District Court issued an "Order to Show Cause Re: Dismissal for Lack of Prosecution." District Court Docket # 6. On 8/7/13, the District Court entered an order and judgment dismissing the Appeal without prejudice for lack of prosecution. District Court Docket # s 7, 8.

### 2. Argyle

Argyle is Path Media's "U.S. Representative" with the power to enter into agreements and sue on behalf of Path Media. SS ¶ 67; SGI ¶ 67 (undisputed). On 3/22/13, after Wynn LV filed the Motions for Trustee, "at Francis's direction, the Debtors' employees were given new email accounts ending in '@argyleonline.com.' " SS ¶ 84; SGI ¶ 84 (undisputed).

Argyle has asserted that it holds a "license from Path [Media] for the use of the Trademarks in connection with products using such Trademarks . . ." and that Path Media had assigned Argyle "the right to bring the causes of action hereunder that would otherwise belong to Path [Media]." AP Docket # 1 ¶¶ 11, 14.

### 3. Adversary Proceeding

#### a. Complaint

On 5/22/13, Argyle filed a complaint (Complaint) that initiated an adversary proceeding (AP) against "R. Todd Neilson solely in his capacity as Chapter 11 Trustee for the estates of GGW Brands, LLC, GGW Direct, LLC, GGW Events, LLC and GGW Magazine, LLC, and related estates." AP Docket # 1. The Complaint, which contained causes of action for conversion and slander of title, was based on alleged statements made by the Trustee that Path Media, Argyle's purported assignor, did not have the right to use the Trademarks. *Id.*

#### b. Counterclaim and Third Party Complaint

On 5/23/13, the Trustee filed "Counterclaims and Third–Party Complaint to Avoid and Recover Fraudulent Transfers and for Conversion" against Path Media, Francis, Argyle Media Sales, LLC and Fab Films, LLC (collectively Argyle) (Fraudulent Transfer Complaint). AP Docket # 4. The Fraudulent Transfer Complaint sought to avoid transfer of, and recover royalties related to, the Trademarks. *Id.* ¶ 1.

#### c. Temporary Restraining Order

On 5/23/13, the Trustee also filed a "Motion for (1) A Temporary Restraining Order Against Joseph R. Francis and Path Media Holdings, LLC, and (2) An Order to Show Cause Why a Preliminary Injunction Should Not Issue Against Francis, Path Media, Argyle Online, LLC, Argyle Media Sales, LLC, and Fab Films, LLC" (TRO Motion). AP Docket # 5. The TRO Motion sought to enjoin Francis and Path Media from taking any further action with respect to the Trademarks. *Id.* ¶ 1. After a hearing on 5/24/13, the Court entered an order granting the TRO Motion and set-ting a preliminary injunction (PI) hearing on 6/7/13. AP Docket # 21.

On 5/30/13, the parties filed a stipulation to continue the PI hearing to 7/8/13. AP Docket # 30. The Court entered an order approving this stipulation on 5/31/13. AP Docket # 33. On 6/7/13, the parties filed a stipulation to further continue the PI hearing to 10/22/13. AP Docket # 38. On 6/7/13, the Court entered an order approving this stipulation and continuing the PI briefing schedule. AP Docket # 40.

#### d. Discovery Requests

On 5/31/13, the Trustee served Brendt Butler (Butler), Argyle's counsel, with the Discovery Requests. Pfister 8/22/13 Decl. ¶ 4, Ex. A. Interrogatory No. 4 sought information regarding "the circumstances (including when, how, who was involved, and what consideration, if any, was exchanged) by which Path Media acquired title to the Trademarks." *Id.* Interrogatory No. 14 sought information concerning "all business or commercial activities in which [Argyle is] currently engaged or in which [Argyle has been] engaged during this calendar year 2013. . . ." *Id.*

As discussed below, Butler withdrew from representing Argyle on 7/22/13. On 8/6/13, the Trustee's counsel contacted Michael Kolodzi (Kolodzi), Argyle's new counsel, regarding the Discovery Requests. Pfister 8/22/13 Decl. ¶¶ 11–14, Ex. B. Kolodzi agreed to provide responses to the Discovery Requests by 8/16/13. *Id.* As of 8/22/13, the Trustee had yet to receive any responses. Pfister 8/22/13 Decl. ¶ 17.

#### e. Trustee MTD/MTS and Argyle MTD

On 6/21/13, the Trustee filed a Motion to Dismiss and/or Strike the Complaint (Trustee MTD/MTS). AP Docket # 46. In the Trustee MTD/MTS, the Trustee argued that the Complaint should be dismissed without leave to amend because the litigation privilege barred all of Argyle's

claims. *Id.* Alternatively, the Trustee contended that the Complaint should be stricken under § 425.16 of the California Code of Civil Procedure (CCP), which is commonly referred to as the "Anti–SLAPP Statute." [29] AP Docket # 46.

On 6/24/13, the Court entered a scheduling order, setting 7/18/13 as the deadline for filing oppositions to the Trustee MTD/MTS (6/24/13 SO). AP Docket # 50.

On 6/28/13, Argyle filed a motion to dismiss the Fraudulent Transfer Complaint (Argyle MTD). AP Docket # 53. On 7/3/13, the Court entered a scheduling order regarding the Argyle MTD. AP Docket # 56.

Although the 6/24/13 SO set 7/18/13 as the date for filing oppositions to the Trustee MTD/MTS, no oppositions were timely filed.

### f. Withdrawal Motion

On 7/18/13, Butler—counsel for Francis, Argyle, and other related parties—filed a "Motion to be Relieved as Counsel of Record" (Withdrawal Motion). AP Docket # 61. On 7/19/13, the Court held a hearing on the Withdrawal Motion (7/19/13 Hearing). During the 7/19/13 Hearing, the Court noted that there had been no opposition to the Trustee MTD/MTS. The Court stated that due to the issues raised in the Withdrawal Motion, it would extend the deadline one week—to 7/24/13—for filing an opposition to the Trustee MTD/MTS. The Court requested that Butler notify Argyle that the deadline for filing an opposition would be extended to 7/24/13. Additionally, the Court stated that there would be no further continuances and, pursuant to Local Bankruptcy Rule (LBR) 9013–1(h), failure to file an opposition

would be deemed consent to the relief requested in the Trustee MTD/MTS. The Court also informed Butler that an incorrect CM–ECF event code was used to file the Argyle MTD and that the matter needed to be re-filed using the correct CM–ECF code.

On 7/22/13, Butler filed a "Supplemental Declaration of Brendt C. Butler in Support of Motion to be Relieved as Counsel of Record" (Butler Decl.) AP Docket # 68. The Butler Decl. indicated on 7/19/13, Butler informed Francis that the Court had ordered any opposition to the Trustee MTD/MTS to be filed by 7/24/13 and pursuant to the LBRs, failure to file a timely response would be deemed consent to granting the Trustee MTD/MTS. *Id.* Butler also indicated that the Argyle MTD had to be refiled to reflect the correct CM–ECF code. *Id.* On 7/22/13, the Court entered an Order granting the Withdrawal Motion. BK Docket # 256.

### g. First Amended Counterclaims and Third Party Complaint

On 7/19/13, the Debtors filed the FACC. AP Docket # 63. On 7/19/13, the Debtors also filed a Statement Regarding the FACC and a Request to Deem Moot the Argyle MTD (Statement). AP Docket # 64. On 7/22/13, the Court entered an Order: 1) Deeming Moot the Argyle MTD; and 2) Modifying the Briefing Schedule on the Trustee MTD (7/22/13 Order). AP Docket # 67. The 7/22/13 Order indicated that the FACC superseded the Complaint and that, as a result, the Argyle MTD was moot. *Id.* The 7/22/13 Order also memorialized the briefing deadlines the Court set during the 7/19/13 Hearing. *Id.*

The FACC contains the following nine causes of action:

---

**29.** SLAPP is an abbreviation for "strategic lawsuit against public participation." *Equilon Enters. v. Consumer Cause, Inc.,* 29 Cal.4th 53, 124 Cal.Rptr.2d 507, 52 P.3d 685, 687 (2002).

| Count | Against | On Behalf of | Basis |
|---|---|---|---|
| 1 | Path Media and Francis | All Debtors | Actual Intent Fraudulent Transfer re: Assignments (11 U.S.C. § 548(a)(1)(A)) |
| 2 | Path Media and Francis | GGW Brands and GGW Marketing | Actual Intent Fraudulent Transfer re: Assignments (11 U.S.C. 8548(a)(1)(A)) |
| 3 | Path Media and Francis | All Debtors | Constructive Fraudulent Transfer re: Assignments (11 U.S.C. § 548(a)(1)(B)) |
| 4 | Path Media and Francis | GGW Brands and GGW Marketing | Constructive Fraudulent Transfer re: Assignments (11 U.S.C. § 548(a)(1)(B)) |
| 5 | Argyle Online, Path Media and Francis | All Debtors | Actual Intent Fraudulent Transfer re: Termination/Relicense and License Fee |
| 6 | Argyle Online, Path Media and Francis | GGW Direct | Actual Intent Fraudulent Transfer re: Termination/Relicense and License Fee |
| 7 | Argyle Online, Path Media and Francis | All Debtors | Constructive Fraudulent Transfer re: Termination/Relicense and License Fee |
| 8 | Argyle Online, Path Media and Francis | GGW Direct | Constructive Fraudulent Transfer re: Termination/Relicense and License Fee |
| 9 | Path Media, Francis and Argyle | | Conversion |

FACC at 11–20.

### h. Dismissal of Complaint

On 7/23/13, Argyle filed a "Notice of Dismissal Pursuant to Federal Rules of Civil Procedure 41(a) or (c) and FRBP 7041" (Notice of Dismissal). AP Docket # 70.

On 7/24/13, the Court held a status conference regarding the Complaint. During the status conference, counsel for the Trustee appeared but no appearances were made on behalf of Argyle or any other party. The Trustee's counsel indicated that the Trustee intended to proceed with the motion to strike (MTS) portion of the Trustee MTD/MTS despite the dismissal of the Complaint. Counsel indicated that he would brief the issue of whether it was appropriate for the Court to award attorneys' fees based on the MTS even though the Complaint had been dismissed.

On 7/26/13, the Court entered an "Order Following Status Conference" (7/26/13 Order). The 7/26/13 Order indicated that, by 8/5/13, the Trustee could file a supplemental memorandum regarding whether, in light of the Notice of Dismissal, the Court had jurisdiction to order further relief in connection with the MTS and, what, if any, attorneys' fees or other relief was appropriate if the MTS were granted. AP Docket # 74. The 7/26/13 Order also indicated that Argyle could file an opposition to the Trustee's supplemental memorandum by 8/12/13. *Id.* On 8/5/13, the Trustee filed the "Trustee's Supplemental Memorandum in Connection with Motion to Strike" (Supp. Memo.). AP Docket # 78.

In the Supp. Memo., the Trustee asserted that the Court had jurisdiction to hear the MTS despite the dismissal of the Complaint, and requested an "award of $35,000 as attorneys' fees pursuant to CCP section 425.16(c)(1)." Supp. Memo. at 5. On 8/14/13, Argyle filed an untimely "Limited Opposition to Trustee's Motion to Strike." AP Docket # 95.

### i. Ruling on Motion to Strike

On 8/29/13, the Court held a hearing on the MTS (8/29/13 Hearing). The day before the 8/29/13 Hearing, the Court issued a tentative ruling that was emailed to counsel for the Trustee and Argyle (Tentative Ruling). In the Tentative Ruling, the Court granted the MTS and awarded the Trustee $35,000 in legal fees. AP Docket # 110. During the 8/29/13 Hearing, the Trustee's counsel appeared but there were no appearances for Argyle. The Court then adopted its Tentative Ruling as its final ruling (Ruling). *Id.* On 9/3/13, the Court entered an order granting the MTS and awarding the Trustee $35,000 in attorneys' fees. AP Docket # 113.

## C. Pleadings

### 1. MSJ

On 8/22/13, the Trustee filed the MSJ, in which he seeks a determination that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law regarding counts 1 through 8 of the FACC. AP Docket # 96.

The Trustee asserts that even though Francis created a "tangle" of putatively distinct legal entities in an effort to elude his creditors' claims, there is "only one real business enterprise: the Girls Gone Wild franchise" (Franchise). MSJ at 1. According to the Trustee, before November 2011, the Franchise's assets—including the intellectual property rights on which the entire Franchise depends—belonged to the Debtors. *Id.* Beginning in November 2011, when Francis's creditors were "closing in," he began to "systematically denude the Debtors of their property." *Id.*

Next, the Debtors assigned the Trademarks to Path Media for no consideration. MSJ at 6. The reason for the Assignments was to "separate the ownership of the intellectual property from the operating companies"—without actually changing the beneficial ownership of the Franchise—so that no "creditor of the operating company [could] seize the intellectual property." MSJ at 1. Notwithstanding the Assignments, the Debtors continued to use and exploit the Trademarks without paying any fees or royalties to Path Media. MSJ at 6.

As a result of the integrated Termination/Re–License, the Debtors' previously unlimited right to use the Girls Gone Wild IP was "sharply curtailed" and the Debtors were drained of virtually all of their cash two days before filing for bankruptcy. MSJ at 1–2. On 2/25/13, Path Media, a Francis controlled entity, acting at the direction of Francis's personal attorney, Tym, purported to terminate the Debtors' right to use the Girls Gone Wild IP and then to re-license the same IP on a short-term, high cost basis: approximately three months of use for $274,250.52, which left Debtors with less than $2,000 in cash when they filed for bankruptcy. MSJ at 2.

Further, because of the Assignments and the Termination/Re–License, the Debtors were effectively set to "self destruct" just three months after filing for bankruptcy. MSJ at 2. According to the Trustee, if the bankruptcy cases did not proceed as Francis and his lawyers planned, the Franchise would "simply be operated by Path Media and/or Argyle (or whatever new entity Francis formed)." *Id.* The Trustee notes that the day after

Wynn LV filed the Motion for Trustee, BK Docket # 29, Francis directed the systematic destruction of the Debtors' electronic files, email messages, and legal records and gave all employees new email accounts ending in "@argyleonline.com," "evidencing that Argyle Online would be the 'new shell' from which the core business would operate once the Debtors' corporate carcasses were abandoned." *Id.*

The Trustee asserts that even though there are five Debtors, the single business enterprise doctrine allows the court to disregard these purportedly separate legal forms to hold one Debtor liable for the debts of another. MSJ at 13–14. And, the Trustee argues that the Court can also consider and draw an adverse inference from Argyle's failure to respond to discovery and Francis' willful destruction of emails and other electronic evidence. MSJ at 14–15. The Trustee contends that the Court should grant the MSJ because the Assignments and Termination/Re–License are avoidable transfers pursuant to 11 U.S.C. §§ 548(a)(1)(A) and (a)(1)(B). MSJ at 15–24.

### a. Property

According to the Trustee, the Trademarks (including the URLs) and the $274,250.52 Fee are all property of the Debtors and constitute "an interest of the debtor in property" pursuant to § 548(a)(1). MSJ at 16–18. The Trustee notes that the FACC sets out two alternative theories regarding which Debtor(s) owned certain property. MSJ at 17–18. Counts 1, 3, 5, and 7 are pled on behalf of all Debtors as a single business enterprise. *Id.* Counts 2, 4, 6, and 8 are pled on a traditional entity-by-entity basis. *Id.* The Trustee claims that he intends to move for substantive consolidation of the Debtors' estates and therefore, it might not be necessary for the Court to rule on the single

business enterprise theory. *Id.* Nevertheless, the Trustee argues that "it is simply indisputable that at all times relevant to this [AP], the Debtors 'integrate[d] their resources and operations to achieve a common business purpose.'" *Id.* According to the Trustee, "[t]he evidence compels the conclusion that there is just one basic business"—the Franchise—and that "inequity would flow" from allowing Francis, Argyle, or Path Media to assert their separateness "to commit frauds and other misdeeds with impunity." MSJ at 18.

### b. Transfer

The Trustee claims that the Assignments constitute a transfer pursuant to 11 U.S.C. § 548(a)(1) because of "the purported conveyance to Path Media of fee simple title to the Trademarks." *Id.* Regarding the Termination/Re–License, the transfer was the "sharp curtailment of the Debtors' previously unlimited right to use the Trademarks, together with the payment of $274,250.52 purported licensing fee." *Id.* The Trustee contends any argument that the Termination/Re–License was not a transfer because Path Media unilaterally sent the Termination Notice must fail. MSJ at 18–19. According to the Trustee, prepetition contractual modifications are transfers of property interests. *Id.* (citing *Greenspan v. Orrick, Herrington & Sutcliffe LLP (In re Brobeck, Phleger & Harrison LLP),* 408 B.R. 318, 338–39 (Bankr. N.D.Cal.2009) (law firm's modification of a partnership agreement was a "transfer" within the meaning of section 548); *Lehtonen v. Time Warner, Inc. (In re PurchasePro.com Inc.),* 332 B.R. 417, 430 (Bankr. D.Nev.2005) (termination and modification of a warrant was a transfer of property); *In re Robotics Vision Sys., Inc.,* 322 B.R. 502, 508 (Bankr.D.N.H.2005) (voluntary surrender of rights under technology license was a transfer of property)). The Trustee also notes that the authority to

avoid fraudulent transfers is flexible and "looks to substance rather than form and protects creditors from any transactions ... that have the effect of impairing [creditors] rights." MSJ at 19 (quoting *Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 793 (7th Cir.2009) (internal quotation marks omitted)).

### c. Two Years

The Original GGW Debtors filed bankruptcy on 2/27/13 and GGW Marketing, LLC filed bankruptcy on 5/22/13. MSJ at 19–20. The Assignments occurred in November 2011 and the Termination/Re–License occurred in February 2013. *Id.* Therefore, the Trustee argues that all transfers at issue indisputably occurred "within 2 years before the date of the filing of the petition" as required by § 548(a)(1). *Id.*

### d. Actual Intent to Hinder, Delay, or Defraud

The Trustee contends that the requisite actual intent to hinder, delay, or defraud is evidenced by the sworn testimony of the two attorneys who orchestrated the transactions at issue. MSJ at 20–21. Regarding the Assignments, Klueger testified that his task was "to separate the ownership of the intellectual property from the operating companies" without actually changing the beneficial ownership of the Franchise so that no "creditor of the operating company [could] seize the intellectual property." *Id.* Klueger also testified that this work was not undertaken for tax planning purposes and that he created the off-shore entities because having assets outside the reach of United States courts makes it "[j]ust more difficult for a creditor to be able to access the assets." *Id.* Regarding the Termination/Re–License, Tym explained that he did not "want to tie [the intellectual property] up in the bankruptcy" and that Path Media wanted to keep

the Debtors on a short leash "to see what life was like dealing with someone in bankruptcy." *Id.*

The Trustee also asserts that in addition to the above direct evidence of actual intent, a Court can "infer fraudulent intent from the circumstances surrounding the transfer," taking particular note of certain recognized indicia or badges of fraud set forth in *Acequia Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 806 (9th Cir. 1994). MSJ at 21–23. According to the Trustee, all five "badges of fraud" exist in this case. *Id.*

First, at the time of the Assignments, lawsuits were either pending or soon to be filed against the Debtors. MSJ at 21–22. Additional lawsuits were pending in February 2013, when the Termination/Re–License occurred. *Id.* And, in the Nevada Case, the Nevada state court found that there was a "substantial likelihood of success on the merits" on the claim that GGW Direct, LLC, GGW Brands, LLC, and GGW Events, LLC were the "alter ego" of Francis. *Id.* Second, the Assignments and the Termination/Re–License transferred all or substantially all of the Debtors' property. MSJ at 22. Specifically, the Trustee asserts that Debtors' entire business—both individually and as a single enterprise—depends on the use of the Trademarks. *Id.* Without the Trademarks, the Debtors would have no business. *Id.*

Third, the Assignments and Termination/Re–License caused insolvency or other unmanageable indebtedness. *Id.* The Trustee asserts that without the Trademarks, the Debtors had zero or close to zero assets. *Id.* The Trustee states that GGW Marketing, LLC dissolved shortly after the Assignments and the Original GGW Debtors listed combined assets of $7,211,878.96 and combined liabilities of $66,190,850.61 in their bankruptcy sched-

ules. *Id.* Fourth, the Trustee argues that the relationship between Francis, Path Media, Ridgewood, and the Debtors constitutes a special relationship between the Debtors and the transferee. MSJ at 22–23. Finally, the Debtors retained and continued to use the Trademarks despite the Assignments without paying Path Media or entering into any licensing agreement until immediately before the Original GGW Debtors filed bankruptcy. MSJ at 23.

### e. Constructive Fraud

#### i. Less than Reasonably Equivalent Value

Alternatively, the Trustee contends the Assignments and Termination/Re–License transactions are avoidable as constructive fraudulent transfers. MSJ at 23–24. The Trustee first asserts there can be no dispute the Debtors received "less than reasonably equivalent value" because they received nothing in exchange for the Assignments. MSJ at 23. The Trustee contends the Termination/Re–License was similarly one-sided because the Debtors gave Path Media almost $275,000 (virtually all of the Original GGW Debtors' cash) and in return received "a sharply curtailed right to use intellectual property that they had previously never had to pay for." *Id.*

#### ii. Insolvency

The Trustee next argues that after the Assignments and Termination/Re–License, the Debtors became insolvent under the three measures of insolvency provided in 11 U.S.C. § 548(a)(1)(B)(ii). MSJ at 23–24.

First, the Trustee asserts that at the time of the Assignments, GGW Marketing, LLC had substantial liabilities in the form of "massive litigation exposure" and no assets. MSJ at 24. Further, the Trustee states that the other Debtors also faced massive litigation exposure, and after the Assignments, had minimal assets, because the Trademarks were their "most important" asset. *Id.* The Trustee claims these facts show that the Debtors were: 1) insolvent on the date of the Assignments or as a result of the Assignments (11 U.S.C. § 548(a)(1)(B)(ii)(I)), 2) left with unreasonably small capital as a result of the Assignments (11 U.S.C. § 548(a)(1)(B)(ii)(II)), and 3) intending to incur debts beyond their ability to pay as the debts mature (11 U.S.C. § 548(a)(1)(B)(ii)(II)). *Id.*

Second, the Trustee asserts the Termination/Re–License occurred at most two days before the Original GGW Debtors filed bankruptcy and that the Original GGW Debtors listed combined assets of $7,211,878.96 and combined liabilities of $66,190,850.61 in their schedules. *Id.* The Trustee argues these facts demonstrate: 1) "obvious" insolvency under 11 U.S.C. § 548(a)(1)(B)(ii)(I) and (III), and 2) "unmanageable indebtedness" under 11 U.S.C. § 548(a)(1)(B)(ii)(II). *Id.*

### 2. Opposition

On 9/12/13, Argyle filed the Opposition in which it disputes several facts and argues that because these disputes create genuine issues of material fact, the Court cannot grant the MSJ. AP Docket # 116.

As a preliminary matter, Argyle argues that GGW Marketing, LLC's bankruptcy petition is null, void, and of no legal force or effect. Opposition at 10. Argyle contends that GGW Brands, LLC did not have authority to file bankruptcy on behalf of GGW Marketing, LLC because GGW Brands, LLC was neither a member nor a manager of GGW Marketing, LLC. Opposition at 10–14. According to Argyle, Francis "is and always has been" the manager of GGW Marketing, LLC and only GGW Global Brands, Inc. could file such a petition because GGW Global Brands, Inc. was the sole member of GGW Marketing,

LLC. *Id.* Argyle cites Delaware law and several bankruptcy cases explaining that bankruptcy is not "ordinary" business and therefore requires the consent of the company's members. Opposition at 12–14. Argyle contends that because GGW Marketing, LLC's bankruptcy is null and void, 11 U.S.C. § 548(a)(1) does not apply. Opposition at 14.[30]

Next, the Opposition argues that GGW Marketing, LLC was not part of a "single business operation" with the Original GGW Debtors. Opposition at 6. Argyle claims that GGW Marketing, LLC never commingled its business with the business of the Original GGW Debtors and that it "kept books and records separate from those entities." *Id.*

With respect to the Assignments, Argyle argues there were only two lawsuits pending or known to GGW Marketing, LLC at the time of the Assignments and GGW Marketing LLC's counsel advised that it had no significant exposure in these lawsuits. Opposition at 14–15. Argyle asserts that the Trademarks were transferred so that one entity would hold all of the trademarks rather than to hinder, delay, or defraud creditors. Opposition at 7–8. Further, Argyle contends that GGW Marketing, LLC was not insolvent at the time of the Assignments nor did it become insolvent as a result of the Assignments. Opposition at 15. Argyle also claims that GGW Marketing, LLC was not engaged in a business for which it retained unreasonably small capital and it did not intend to incur, or believe it would incur, debts beyond its ability to pay. Opposition at 14–15.

Argyle also disputes the ownership of the URLs at the time of the Assignments. Opposition at 5–6. According to Argyle, GGW Marketing, LLC, rather than GGW Brands, LLC, owned the URLs and GGW Marketing, LLC transferred the URLs at the same time it transferred the Trademarks to GGW Direct, LLC. *Id.* Argyle admits that GGW Brands, LLC paid the "maintenance fees for the [URLs]," but claims that GGW Brands, LLC never had title to the URLs. Opposition at 6.

With respect to the Termination/Re–License, Argyle initially argues that the Original GGW Debtors had no property rights in the Trademarks. Opposition at 16. Argyle contends the Original GGW Debtors and GGW Marketing, LLC operated pursuant to an oral licensing agreement (OLA) until the Assignments, and that GGW Marketing, LLC deferred charging the Original GGW Debtors a $150,000 monthly fee for use of the Trademarks.[31] Opposition at 9–10. This OLA was temporary—a "voluntary accommodation that could be terminated at any time"—and was not intended "to be a permanent arrangement or to obligate successor owners of the intellectual property to

---

**30.** After arguing that § 548(a)(1) does not apply, the Opposition discusses state law claims under "the Uniform Fraudulent Transfer Act of California or Delaware." Opposition at 14. The Trustee has not alleged any fraudulent transfer claims under California or Delaware law. *See* FACC. Therefore, it is unclear whether Argyle is arguing the merits of the Trustee's § 548(a)(1) claims or some hypothetical UFTA claims. Due to the similarities between § 548(a)(1) and the UFTA, the Court will consider Argyle's reference to the UFTA as part of its argument in opposition to the Trustee's § 548(a)(1) claims.

**31.** The Court notes that although the Opposition does not address what the purported arrangement might have been between the date of the Assignments in November 2011 and the date of the Termination/Re–License in February 2013, the Opposition appears to argue that the OLA continued after Path Media acquired the Trademarks.

continue such arrangement." *Id.* Path Media, as the successor owner of the Trademarks, had the right to terminate this arrangement and enter into the License Agreement. *Id.* Argyle asserts that $274,250.52 was fair value for use of the Trademarks for the three-month period from late February through 5/31/13. *Id.* Therefore, Argyle concludes that the Termination/Re–License was not a fraudulent transfer and fair value was given in exchange for use of the Trademarks. *Id.*

### 3. Reply

On 9/19/13, the Trustee filed the Reply, arguing that Argyle did not present admissible evidence or otherwise demonstrate why the Court should not grant the MSJ.

According to the Trustee, Argyle did not challenge any of the legal standards and conceded numerous facts establishing that the Assignments and Termination/Re–License are fraudulent transfers. Reply at 1–2, 3–9. The Trustee asserts that Argyle did not dispute that: 1) the Original GGW Debtors were part of a single business enterprise, 2) all the Debtors used the Trademarks as part of their adult entertainment enterprise, 3) the Trademarks were owned by the Debtors prior to the Assignments, 4) the Trademarks were transferred to Path Media, 5) Klueger made the Assignments, 6) the Termination/Re–License was a single transaction, 7) the Termination/Re–License was entered into two days before the Original GGW Debtors filed bankruptcy, and 8) Tym's statements concerning the purpose of the Termination/Re–License. Reply at 3–9.

By Argyle conceding these facts, the Trustee contends he is entitled to judgment as a matter of law. According to the Trustee, Klueger's statements, as well as the "badges of fraud" support the conclu-

sion the Assignments were a fraudulent transfer. Reply at 6–7.

The Trustee argues that contrary to Argyle's position, GGW Marketing, LLC was insolvent at the time of or as a result of the Assignments. Reply at 10–11. In support, the Trustee cites Francis's 9/13/13 Rule 2004 examination (2004 Exam), during which Francis stated that "GGW Marketing didn't have any assets at the time it was closed or canceled." Reply at 11; Heyn 9/19/13 Decl. ¶ 9, Ex B at 129:17–21. According to the Trustee, this statement demonstrates that GGW Marketing, LLC was insolvent on the date of the Assignments because with no assets, any liability would render GGW Marketing, LLC insolvent under 11 U.S.C. § 101(32). Reply at 11. Therefore, he argues that the Assignments were also a constructive fraudulent transfer. Reply at 7.

With respect to the Termination/Re–License, the Trustee contends that Tym's statements, as well as the "badges of fraud" meet the requirements for an actual fraudulent transfer. Reply at 8–9. Further, the fact that the Debtors received no consideration for, and were insolvent at the time of, the Termination/Re–License, demonstrate that this transaction was a constructive fraudulent transfer. Reply at 9.

The Trustee further argues that Francis's 9/11/12 Decl. should be disregarded as a "sham declaration." According to the Trustee, Francis's statements regarding his knowledge of GGW Marketing, LLC's and Path Media's business are wholly inconsistent with Francis's prior deposition testimony, during which he stated he did not have any knowledge of GGW Marketing, LLC or Path Media. Reply at 9–12.

Turning to Argyle's argument that GGW Marketing, LLC was not validly in bankruptcy, the Trustee contends that res judicata bars Argyle from relitigating this is-

sue. And, although Francis appealed this ruling, the appeal was dismissed. Reply at 12–13. Alternatively, the Trustee contends that Argyle has waived the argument that GGW Marketing, LLC is ineligible to be a debtor. Reply at 13.

## II. Legal Standards

### A. Summary Judgment

FRBP 7056 provides that FRCP 56 applies to motions for summary judgment in adversary proceedings. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). A fact is "material" for purposes of Rule 56 if it "might affect the outcome of the suit under the governing law...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When the movant has carried its burden, the opponent "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ... ruling on a motion for summary judgment." *Rezner v. Bayerische Hypo–Und Vereinsbank AG*, 630 F.3d 866, 871 (9th Cir.2010) (quoting *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505). The sham affidavit doctrine, however, prevents a party who has been examined during a prior deposition from "rais[ing] an issue of fact simply by submitting an affidavit contradicting his own prior testimony," which "would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir.2012) (quoting *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir.1991)).

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); *In re Machuca*, 483 B.R. 726, 737–738 (9th Cir. BAP 2012) (finding creditors' assertion they reasonably relied on Debtor's income representation could not be believed because it was "wholly undermined" by undisputed facts in the record showing "red flags" in connection with loan agreement).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting FRCP 56). If the moving party carries its burden, summary judgment should not be granted if the non-moving party can point to "sufficient evidence supporting the claimed factual dispute" such that a factfinder is needed to "resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505 (internal quotation marks omitted). In

ruling on a summary judgment motion, the court must view the underlying facts in a "light most favorable to the party opposing the motion." *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (internal quotation marks omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

### B. 11 U.S.C. § 548(a)

Pursuant to 11 U.S.C. § 548(a), the Trustee "may avoid any transfer . . . of the debtor in property . . . that was made or incurred . . . within 2 years before the date of the filing of the petition if the debtor voluntarily . . . .:"[32]

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or become insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; [or]

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's

ability to pay as such debts matured.

#### 1. 11 U.S.C. § 548(a)(1)(A)—Elements of Actual Intent Fraudulent Transfer

To prevail on the § 548(a)(1)(A) claim, the Trustee must prove, by a preponderance of the evidence, the following:

1. The Trademarks were property of the Debtors' estates;

2. There was a transfer of the Trademarks;

3. The transfer occurred within two years before the Debtors' petitions were filed; and

4. The transfer was made with the actual intent to hinder, delay or defraud the Debtors' creditors.

*In re Wheeler*, 444 B.R. 598, 605 (Bankr.D.Idaho 2011); *Greenspan v. Orrick Herrington & Sutcliffe, LLP (In re Brobeck Phleger & Harrison, LLP)*, 408 B.R. 318, 338–39 (Bankr.N.D.Cal.2009); *In re Roca*, 404 B.R. 531, 538 (Bankr.D.Ariz. 2009).

"It is often impracticable, on direct evidence, to demonstrate an actual intent to hinder, delay or defraud creditors. Therefore, as is the case under the common law of fraudulent conveyance, courts applying Bankruptcy Code § 548(a)(1) frequently infer fraudulent intent from the circumstances surrounding the transfer, taking particular note of certain recognized indicia or badges of fraud." *In re Acequia, Inc.*, 34 F.3d 800, 805–06 (9th Cir.1994)(internal quotation marks omitted). These circumstances include:

1. Actual or threatened litigation against the Debtor;

---

**32.** Before enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), the avoidance period under 11 U.S.C. §§ 548(a)(1)(A) and (B) was one year.

2. A purported transfer of all or substantially all of the Debtor's property;

3. Insolvency or other unmanageable indebtedness on the part of the Debtor;

4. A special relationship between the Debtor and the transferee; and

5. After the transfer, retention by the Debtor of the property involved in the putative transfer.

*Id.*

The "confluence" of several of these circumstances can constitute conclusive evidence of actual intent to defraud. *Id.*

2. 11 U.S.C. § 548(a)(1)(B)—Elements of Constructively Fraudulent Transfer

To prevail on a § 548(a)(1)(B) claim, the Trustee must prove, by a preponderance of the evidence, the following:

1. The Trademarks were property of the Debtors' estate;

2. There was a transfer of the Trademarks;

3. The transfer occurred within two years before the Debtors' petitions were filed; and

4. The Debtors received less than reasonably equivalent value in exchange for the Trademarks; and

5. The Debtors either,

 a. Were insolvent on the date of the transfers or became insolvent because of the transfers;

 b. Were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining was an unreasonably small capital; or

 c. Intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

*In re Heddings Lumber & Bldg. Supply, Inc.,* 228 B.R. 727, 729 (9th Cir. BAP 1998); *In re Brobeck Phleger & Harrison LLP,* 408 B.R. at 340–41.

### III. Analysis

A. Preliminary Matters

 1. Sham Affidavit Rule

 a. Testimony at Issue

In support of the Opposition, Argyle submitted the Francis 9/11/13 Decl., in which Francis makes numerous representations regarding his knowledge of, and involvement with, GGW Marketing, LLC, including:

1. "I am President of GGW Global Brands, Inc. (formerly known as GGW Brands, Inc.), and have always been its President since its creation in 2006" ¶ 2. "GGW Global Brands, Inc. (formerly known as GGW Brands, Inc.) has been the sole Member of GGW Marketing, LLC since the date of the creation of GGW Marketing, LLC in 2006. Attached hereto as Exhibit A is a true and correct copy of the Operating Agreement of GGW Marketing, LLC executed by me in November, 2006. The Operating Agreement, which has never been amended, shows in the Exhibit attached thereto that GGW Brands, Inc. is the sole Member. GGW Global Brands, Inc. (formerly known as GGW Brands, Inc.) and GGW Marketing, LLC are unrelated to [the Original GGW Debtors]. The owners of GGW Global Brands, Inc. have been Kaafu

Technology, LLC (2013) and Aero Falcons, LLC (2006–2012)" ¶ 3;

2. "In 2006, I asked Michael Kerry Burke, an attorney, to review the organizational documents for GGW Marketing, LLC and confirm through a legal opinion that GGW Brands, Inc. owned 100% of GGW Marketing, LLC. Attached as Exhibit B is a true and correct copy of the letter I received on or about November 10, 2006" ¶ 4;

3. "I have been the Manager of GGW Marketing, LLC since the date of its formation in 2006" ¶ 5;

4. "GGW Brands, LLC was never a Manager nor was it ever a Member of GGW Marketing, LLC" ¶ 6;

5. "At the time of the cancellation of GGW Marketing, LLC in Delaware and California in 2012, GGW Marketing, LLC was not involved in the distribution of adult entertainment content" ¶ 9;

6. "The business of GGW Marketing, LLC which began four years prior to the creation of the [Original GGW Debtors] was never commingled with the business of the [Original GGW Debtors], never operated as a single business with the Debtors, and GGW Marketing, LLC kept books and records separate and distinct from the [Original GGW Debtors]" ¶ 11;

7. "In November, 2011, as Manager of GGW Marketing, LLC, I executed an assignment of intellectual property owned by GGW Marketing, LLC to Path Media Holdings, LLC. This was merely a mechanism to facilitate all intellectual property, both domestic and international, being held by one entity. It was not done with the intent to hinder, delay or defraud creditors of GGW Marketing, LLC. GGW Marketing was not insolvent at the time or rendered insolvent by the transfer. Indeed, I had been advised by counsel representing GGW Marketing, LLC that GGW Marketing, LLC had no significant exposure in either of two lawsuits then pending against GGW Marketing, LLC: *Etagz, Inc. v. Cheri Magazine et al.*, Case No. 2:10–cv–01266 (D. Utah, filed December 10, 2010)(which the court subsequently ruled lacked personal jurisdiction over GGW Marketing, LLC), and *Creditors Adjustment Bureau, Inc. v. Mantra Films, Inc. et al.*, Case No. SC 113754 (Los Angeles Sup. Ct. filed August 11, 2011)(which did not result in any judgment against GGW Marketing, LLC)" ¶ 12;

8. "It was not until 5 months after the transfer of the trademarks that two other suits were filed against GGW Marketing, LLC. These lawsuits were not anticipated at the time of the transfer of the trademarks to Path Media Holdings, LLC. The two lawsuits were: *Rayment v. GGW Brands, LLC et al.*, Case No. CJ–2012–01321 (Tulsa County, Oklahoma Dist. Ct. filed Mar. 12, 2012)(which GGW Marketing, LLC believes lacks merit and intends to defend and appeal as soon as the bankruptcy stay is lifted, as GGW Marketing, LLC was never served and the court lacked personal jurisdiction); and *Favazza v. Path Media Holdings, LLC et al.*, Case No. 4:12–cv–10561 (E.D. Mo. Filed Aug. 29, 2012)(which the court quashed as to service of process upon GGW Marketing, LLC in an order issued

May 3, 2013)" ¶ 13 (emphasis omitted);

9. "From the time of creation of [the Original GGW Debtors] in 2010, to the date of transfer of the trademarks by GGW Marketing, LLC to Path Media Holdings, LLC in November, 2011, [the Original GGW Debtors] were permitted by GGW Marketing, LLC, pursuant to an oral intellectual property licensing agreement, to use the intellectual property owned by GGW Marketing, LLC and licensing fees for such use, at the rate of $150,000 per month, were deferred. This was intended as a temporary arrangement until the [Original GGW Debtors] had a chance to get their businesses fully functional and at maximum profitability. It was a voluntary accommodation that could be terminated at any time. As Manager of GGW Marketing, LLC, I had agreed to this because years earlier I had founded the Girls Gone Wild brand and established the trademarks and other intellectual property and I wanted to see the brand continue. It was never intended to be a permanent arrangement or to obligate successor owners of the intellectual property to continue such arrangement" ¶ 15;

10. "Following the Assignments of intellectual property by GGW Marketing, LLC to Path Media, neither I nor Path Media instructed distributors to remit Royalties arising out of or relating to the intellectual property to Argyle rather than to the [Original GGW Debtors]" ¶ 17;

11. "At the time GGW Marketing, LLC transferred the intellectual property to Path Media Holdings, LLC, GGW Marketing, LLC was not engaged or was about to engage in a business or a transaction for which the remaining assets of GGW Marketing, LLC were unreasonably small in relation to the business or transaction. At the time GGW Marketing, LLC transferred the intellectual property to Path Media, GGW Marketing, LLC did not intend to incur or believe or have reason to believe that it would incur, debts beyond its ability to pay as they became due" ¶ 19; and

12. "The url's utilized by [the Original GGW Debtors] were never owned by any of those entities. They were owned by GGW Marketing, LLC and then transferred by GGW Marketing, LLC to Path Media in 2011 when the trademarks were transferred. As part of the oral licensing agreement between GGW Marketing, LLC and GGW Brands, LLC, maintenance fees for the url's were paid by GGW Brands, LLC but GGW Brands, LLC was never given title to such url's" ¶ 21.

During Francis's 4/18/12, deposition, taken in connection with the California Marker Judgment Litigation, Francis testified, under oath, that he had "Never heard of" GGW Marketing, LLC. He also testified that he did not "do any work" for GGW Marketing, LLC. Heyn 7/15/13 Decl. ¶ 12(d), Ex. E at 5:16–21 and 70:20–21.

Further, in the Francis 9/11/13 Decl., Francis stated the following regarding Path Media and Argyle:

1. "I am not currently the Manager of Path Media Holdings, LLC. To my knowledge, Asia Trust is the current Manager of Path Media Holdings, LLC and Hammersmith Trust is the sole Member. I am neither the set-

tlor nor a beneficiary of the Hammersmith Trust. I have never controlled Path Media. When I was Manager of Path Media, it was controlled by [sic] AsiaTrust on behalf of Ridgewood Global Trust, the Member at the time" ¶ 14; and

2. "Argyle Online is owned by Hammersmith Trust, of which I am neither settlor nor beneficiary. The manager of Argyle Online is Abbey Wilson. While she and I have a personal relationship, she independently runs Argyle Online and I do not control her or her decisions" ¶ 16.

During Francis's 7/12/13 Deposition, taken in connection with California Marker Judgment Litigation, however, Francis answered the following questions in the following manner:

Q: Do you currently have a familiarity with a company called Argyle Media Sales?

A: No, not really.

Q: Not really?

A: No.

Q: Are you familiar with any company that has Argyle in the name?

A: No.

. . .

Q: Do you know anything about the ownership, management or operations of Argyle Online?

A: Nope.

. . .

Q: Do you know anything about the owners, members, manager of Path Media Holdings?

A: Nope.

Q: What is Path Media Holdings?

A: I do not know.

Heyn 9/19/13 Decl. ¶ 10, Ex. C at 6:21–28 and 12:20–24.

### b. Objections, REO, 9/27/13 Order, and Reply Objections

On 9/19/13, the Trustee filed the Objections, in which he asserts numerous evidentiary objections to the Francis 9/11/13 as well as the Snow 9/11/13 Decl., Dale 9/11/13 Decl., and Greenfield 9/11/13 Decl.[33] The Trustee asserts that most of Francis's declaration is inadmissible because: 1) it is a sham declaration, 2) the statements are blatantly contradicted by the record, and 3) Francis's statements are conclusory and uncorroborated by the record.

On 9/26/13, Argyle filed a "Response to Evidentiary Objections Raised by Movants" (REO), AP Docket # 127, as well as a Declaration of Joseph R. Francis (Francis 9/26/13 Decl.). AP Docket # 128. Although the REO purportedly responds to the Objections filed by the Trustee, it also contained arguments related to res judicata and insolvency. *Id.* at 5, 7–10. On 8/23/13, the Court entered an Order (8/23/13 Order), which set the MSJ for hearing on 10/3/13, and provided the deadlines for filing an opposition and reply to the MSJ. AP Docket # 106. The 8/23/13 Order stated explicitly that "No further

---

**33.** The Trustee objects to the Snow 9/11/13 Decl., Dale 9/11/13 Decl., and Greenfield 9/11/13 Decl. on the basis that they are irrelevant to the issue before the Court because they pertain to GGW Marketing, LLC's status as a debtor. Objections at 6. As analyzed below, the issue whether GGW Brands, LLC had authority to revoke the cancellation of, and file bankruptcy on behalf of, GGW Marketing, LLC, is barred by the law of the case doctrine and collateral estoppel. To the extent that the Snow 9/11/13 Decl., Dale 9/11/13 Decl., and Greenfield 9/11/13 Decl. address that issue, they are irrelevant and were not considered. To the extent that those declarations addressed other issues, they were considered as indicated in the applicable sections of the analysis.

briefing will be allowed or considered." *Id.* at 2. Therefore, to the extent that the REO addresses issues related to res judicata and insolvency, it was not considered.

The Court, however, does believe it is appropriate to consider the arguments in the REO, which respond to the Trustee's Objections. In the REO, Argyle contends that the Trustee's Objections "mischaracteriz[e]" Francis's testimony and that the Francis 9/11/13 Decl. does not conflict with either his 4/18/12 or 7/12/13 deposition testimony. REO at 1. To support this contention, Argyle cites the Francis 9/26/13 Decl., in which Francis states that during his 4/18/12 deposition he was deposed as the person most knowledgeable about Mantra Films, Inc. and he was not prepared to answer questions about any other entity. Francis 9/26/13 Decl. ¶ 4. Francis claims during that deposition, the attorney asked about each of the GGW entities "in rapid fire succession" and that when the attorney came to GGW Marketing, LLC, he initially mistakenly began to answer "Never heard of ..." but then caught himself and before completing the sentence, he stated, "I don't do any work" for GGW Marketing, LLC. *Id.* According to Francis, this was true because GGW Marketing, LLC ceased all operations after the Assignments. Francis claims that he was also asked about his "then current relationships" with the GGW Entities and he was speaking in the present tense when he said "I don't do any work" for GGW Marketing, LLC.[34] *Id.* Therefore, according to Argyle, the Francis 9/11/13 Decl. does not "contradict any [of Francis's] prior deposi-

tion testimony" regarding GGW Marketing, LLC. REO at 5.

Argyle also asserts that the Francis 9/11/13 Decl. is not contradictory to the testimony that Francis gave during his 7/12/13 deposition regarding Path Media. REO at 6–7. In the Francis 9/26/13 Decl., Francis claims that his management of Path Media ended in November 2012 and his deposition testimony—that he did not know anything about the owners, members or managers of Path Media—was true because he did not know who the owners, members or managers "presently were." Francis 9/26/13 Decl. ¶ 6. Francis also claims that since his deposition was taken on 7/12/13, he has "come to learn that Path Media is managed by AsiaTrust and owned by the Hammersmith Trust." *Id.* According to Francis, the question "What is Path Media Holdings?" was vague and he understood it to be asking whether he knew what type of entity Path Media was and where it was formed. *Id.* at ¶ 7. Francis claims that he did not remember that information, and therefore, he answered that he did not know. *Id.*

On 9/27/13, the Court entered an "Order Setting Final Briefing Deadlines" related to the MSJ (9/27/13 Order). AP Docket # 131. In the 9/27/13 Order, the Court indicated that: 1) it would consider the arguments in the REO that responded to the Objections, and 2) the Trustee would have until 9/30/13 at noon to respond to the issues raised in the REO related to the Objections. *Id.* at 2. On 9/30/13, the Trustee filed a timely "Reply in Further Support of Evidentiary Objections" (Reply Objections). AP Docket # 133. In the Reply Objections, the Trustee contends that "no

---

34. Argyle also explains why Francis, during his 4/18/12 deposition, stated that he did not know about the ownership of the GGW Entities. He claims that he was never GGW Marketing, LLC's creative consultant and there-

fore, he did not understand the term GGW Entities to include GGW Marketing, LLC. The Court did not rely on this portion of Francis's 4/18/12 deposition in adjudicating the MSJ.

reasonable trier of fact could believe Francis's flimsy explanation for the stark differences between" the Francis 9/11/13 Decl. and his prior testimony. *Id.* at 2. Further, according to the Trustee, several paragraphs of the Francis 9/11/13 Decl. are contradicted by emails from Francis or documents bearing his signature and therefore, no reasonable trier of fact could believe Francis's "self-serving *post hoc* explanations in light of these documents." *Id.*

### c. Legal Standard

■ Although credibility determinations and weighing evidence are not appropriate when adjudicating a motion for summary judgment, the sham affidavit doctrine prevents a party who has been examined during a prior deposition from "rais[ing] an issue of fact simply by submitting an affidavit contradicting his own prior testimony," because it would "greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Yeager*, 693 F.3d at 1080 (quoting *Kennedy*, 952 F.2d at 266).

■ To trigger the sham affidavit rule, the Court must determine that: 1) the contradiction between the deposition and the declaration or affidavit is a sham, and 2) the inconsistency between the deposition testimony and subsequent affidavit is clear and unambiguous. Assuming these factors are met, the Court can disregard the declaration. *Yeager*, 693 F.3d at 1080. A non-moving party can attempt to explain or clarify prior deposition testimony and "minor inconsistencies that result from an honest discrepancy [or] a mistake" are insufficient to warrant application of the sham affidavit rule. *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 999 (9th Cir.2009).

### d. Application of Sham Affidavit Rule

■ The Court finds that it is appropriate to apply the sham affidavit rule. First, it is clear to the Court that the contradiction between Francis's 4/18/12 deposition testimony and his 9/11/13 declaration regarding GGW Marketing, LLC is a sham. It is impossible to reconcile Francis's earlier deposition testimony that he had never heard of GGW Marketing, LLC and that he did not do any work for that entity with his current statements that he signed GGW Marketing, LLC's operating agreement in 2006, that he has been GGW Marketing, LLC's manager since 2006, and that he has detailed knowledge of GGW Marketing, LLC's business and operations.

Similarly, the Court finds that Francis's statements in his declaration regarding Argyle and Path Media are also a sham. During Francis's 7/12/13 deposition, he claimed that he was not familiar with a company named Argyle and that he did not know anything about Path Media. These statements cannot be reconciled with his 9/11/13 declaration in which he claims that he was the manager of Path Media and that he knew who its member was and who controlled it. *See e.g., Yeager*, 693 F.3d at 1080 (noting that a court may "find a declaration to be a sham when it contains facts that the affiant previously testified he could not remember"); *Kennedy*, 952 F.2d at 266–67 (holding that a court may discount a "sham" declaration that flatly contradicts earlier deposition testimony).

Second, the inconsistencies between Francis's 4/18/12 and 7/12/13 deposition testimony and his 9/11/13 declaration are clear and unambiguous. A year-and-one-half ago, Francis claimed that he had never heard of, and did not do any work for, GGW Marketing, LLC. And, a few months ago, Francis stated that he was not famil-

iar with either Argyle or Path Media. In contrast, Francis now claims that he has been the Manager of GGW Marketing, LLC since its inception in 2006, he authenticates GGW Marketing, LLC's operating agreement and a letter from attorney who reviewed GGW Marketing, LLC's organizational documents, and provides detailed information regarding GGW Marketing, LLC's management, ownership, and business operations. He also now recalls that he was the manager of Path Media and he knows who its member is and who controlled it. He also claims that he knows who owns and manages Argyle and how she "runs" that entity.

### e. Francis's Explanation for the Discrepancies

Although a non-movant can attempt to explain or clarify inconsistencies between prior deposition testimony and a more recent declaration, Francis does not attempt to explain minor inconsistencies and honest discrepancies but instead tries to explain glaringly discordant statements.

As an initial matter, Francis was represented by counsel during both his 4/18/12 and 7/12/13 depositions. Francis and his counsel could have asked for clarification of any vague question and Francis could have clarified any answer to ensure that his answers did not create an incorrect perception. *See Colantuoni v. Alfred Calcagni & Sons, Inc.,* 44 F.3d 1, 5 (1st Cir. 1994) (finding debtor could not "manufacture a disputed issue of material fact by contradicting his own prior sworn testimony" and noting that the declarant's attorney was present during the declarant's prior deposition testimony and he "had the opportunity to clarify any incorrect impressions."). Further, in the Francis 9/11/13 Decl., Francis could have explained why that declaration, which was submitted in support of the Opposition, contradicted

his prior deposition testimony. Francis did not do so. Instead, it was only after the Trustee filed the Objections that Francis advanced an explanation for the contradictions between his 4/18/12 and 7/12/13 deposition testimony and the Francis 9/11/13 Decl. *See Colantuoni,* 44 F.3d at 5 (applying the sham affidavit rule and finding significant that an affidavit contradicting prior testimony was only offered after the filing of a motion for summary judgment).

Any argument that Francis did not realize the Trustee would raise issues related to his 4/18/12 deposition testimony would be unavailing. Francis was made aware of the Trustee's suspicion regarding the conflict between Francis's prior testimony related to GGW Marketing, LLC and his more recent testimony regarding Francis's intimate, firsthand knowledge of GGW Marketing, LLC on 7/26/13—approximately one month before the MSJ was filed—when the Trustee filed the "Ex Parte Application to Continue Response Times and Hearing on GGW Global Brands, Inc.'s Motion to Dismiss." BK Docket # 274. And, the proximity of Francis's 7/12/13 deposition (during which he claimed to have no knowledge of Argyle and Path Media) to the Francis 9/11/13 Decl. (in which he admits that he was manager of Path Media and he knows the owner and manager of Argyle and how the manager "runs" that entity) would belie any assertion that he did not expect the Trustee to raise those inconsistencies in the context of the MSJ.

Additionally, Francis's attempt to explain his 7/12/13 testimony related to Path Media—that he stopped *managing* Path Media in November 2012 and therefore, he did not know who the owners, members, or managers were of that entity at the time of his deposition—is contrary to the evidence in the record. *See* 4/10/13 Trans. at 82:18–

19 ("Through his control over Path Media and its exceedingly valuable IP rights, Francis exercises complete control over debtors."); SGI ¶ 50 (undisputed) (draft 2/26/13 Termination Notice Tym forwarded to Asiaciti that stated "It is my understanding that Asiaciti Pacific Trust is manager of Path Media Holdings, LLC (which is 100% owned by Ridgewood Global Trust)"); SGI ¶ 31 (disputing the fact that "[a]t least one (and perhaps the only) beneficiary of the Ridgewood Global Trust" is Francis on the basis that "Francis was not the *sole* beneficiary of the Ridgewood Global Trust") (emphasis added); Heyn 5/23/13 Decl., Ex. B (2/26/13 email from Tym to Francis indicating that the License Agreement would be between Path Media and Argyle and that Tym had "Path Media (Asiaciti) terminate all licenses that were held by [sic] GGW entities"); Heyn 8/22/13 Decl., Ex. C (4/26/13 email from Francis to Adrian Taylor, Managing Director of Asiaciti Trust Pacific Ltd., "RE: Path Media Holdings, LLC" in which Francis states "Adrian, I NEED YOU TO USE YOUR POWERS AND FIRE RON THIS MONDAY AND APPOINT ABBEY WILSON. FRIDAY WOULD BE CATASTROPHIC. THIS CANT WAIT"; 4/22/13 email Tym forwarded to Francis in which Tym writes to Adrian Taylor, "As you may recall, Path Media Holdings, LLC (of which Asia Trust is Manager) owns the intellectual property of the Girls Gone Wild Brand (trademarks, copyrights, etc)").

Francis's explanation that his answer related to GGW Marketing, LLC was true because he "caught himself" after stating that he "[n]ever heard of" GGW Marketing, LLC and that he interpreted the question to mean whether he presently worked for that entity is not plausible. As the Trustee argues persuasively, Francis does not deny that he testified he had never heard of GGW Marketing, LLC. And,

Francis had an opportunity to correct "the form or the substance" of any answer that he gave during his 4/18/12 deposition, but he did not do so. *See* CCP § 2025.520. The Court finds that no reasonable jury could conclude that Francis had "[n]ever heard of" GGW Marketing, LLC.

Further, contrary to Francis's testimony, GGW Marketing, LLC did not cease all operations after the Assignments. In fact, just two weeks after Francis's 4/18/12 deposition testimony, Francis signed the Certificate of Cancellation that purportedly cancelled GGW Marketing, LLC. Heyn 5/23/13 Decl. ¶ 11, Ex. H. Approximately three months after GGW Marketing, LLC was "cancelled," GGW Marketing, LLC, GGW Brands, LLC and other entities filed a pleading in the District of Utah. Heyn 5/9/13 Decl. ¶ 19, Ex. O. Further evidence that GGW Marketing, LLC did not "cease all operations" after the Assignments is the fact that the 2/25/13 Termination Notice, which was prepared by Tym—who was acting as Francis's personal counsel and counsel for the Debtors, SGI ¶ 49 (undisputed)—was addressed to all of the Debtors, including GGW Marketing, LLC. Therefore, Francis's explanation that he did not do any work for GGW Marketing, LLC because GGW Marketing, LLC ceased all operations by 4/18/12, when his deposition was taken, is implausible. *Yeager v. Bowlin,* 693 F.3d 1076, 1080 (9th Cir.2012) (applying the sham affidavit rule because a reasonable jury could find that the declarant's "weak explanation" for his "sudden ability to remember answers" to important questions was not plausible).

Although Francis claims that the question "What is Path Media Holdings?" was vague, neither he nor his attorney asked for clarification regarding the question. Further, in the Francis 9/26/13 Decl. ¶ 7, Francis states that he understood that question "to be asking me if I knew what

type of entity Path Media was and where it was formed." His claim that he did not remember what type of entity Path Media was or where it is formed is belied by a myriad of undisputed facts. In October 2011, Francis retained Klueger to form offshore entities to hold Francis's IP. Retention Letter ¶ 2. After Klueger formed Path Media, Francis signed documents indicating he owned Path Media. Heyn 5/23/13 Decl. ¶ 9, Ex. F. On 11/15/11, Francis signed the Assignments, which transferred ownership of the Trademarks to Path Media. Heyn 5/23/13 Decl. ¶ 10, Ex. G. In a 2/26/13 email, Tym, who was represented Francis, told Francis that the License Agreement would be between Path Media and Argyle, Path Media's "U.S. Representative." Heyn 5/23/13 Decl. ¶ 5, Ex. B. On 2/25/13, Francis re-directed payments from the Debtors' payment processors to Argyle. On 3/22/13, Francis sent an email to several employees of the Debtors, stating "double check that ALL URLs are under path media holdings." Heyn 5/23/13 Decl. ¶ 20, Ex. Q (emphasis in original).

On 4/10/13, the Court found that Francis controlled Path Media, and through his control of Path Media, exercised complete control over the Debtors. On 4/26/13, Francis sent an email to Adrian Taylor, the Managing Director of Asiaciti Trust Pacific Ltd., with the subject line "RE: Path Media Holdings, LLC" in which Francis demanded that Tym be fired and replaced with Wilson. On 5/22/13, Argyle filed the Complaint against the Trustee, alleging Path Media is the registered owner of the Trademarks and that Path Media assigned to Argyle the right to bring causes of action that would otherwise be-

long to Path Media.[35] The Complaint was filed by Butler, who in addition to representing Argyle, also represented Francis and PSL. AP Docket # 1. This chain of undisputed evidence—which begins in the Fall of 2011 and continues through late May 2013—demonstrates that when Francis's deposition was taken on 7/12/13, he had to have known what type of entity Path Media was and that it was an offshore entity. No reasonable jury could conclude otherwise.

The Court finds that Francis's last minute explanation for his conflicting testimony is not believable and he has not provided a plausible, satisfactory explanation regarding the reason his testimony changed. *See Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir.2012) (finding explanation for discrepancies between deposition testimony and declaration submitted in support of a motion for summary judgment was "unbelievable"); *Campana v. Pilavis (In re Pilavis)*, 244 B.R. 173, 176 (1st Cir. BAP 2000) (applying the sham affidavit rule and noting that the non-movant could not "manufacture a disputed issue of material fact" by contradicting his prior testimony because he did not offer a "satisfactory explanation" regarding the change in his testimony).

### f. Summary of Rulings on Objections

Because the Court finds that the requirements of the sham affidavit rule are met, it is sustaining the Trustee's Objections to the Francis 9/11/13 Decl. on that basis. The Court is disregarding the portions of the Francis 9/11/13 Decl. (and exhibits authenticated by Francis), to which the Trustee objects related to Francis's knowledge of GGW Marketing, LLC and Argyle. In addition to the Court's

---

**35.** During Francis's 7/12/13 deposition, he admitted that he knew Path Media held the Trademarks but claimed that he only knew this through reading bankruptcy filings be-

cause he was "curious" and the bankruptcy filings were "pretty good reading." AP Docket # 126–2, 13:8–23.

rulings on the Trustee's Objections, which are indicated below, the Court is also not considering the following paragraphs of Francis's 9/11/13 Decl., in which he claims specific knowledge related to GGW Marketing, LLC: ¶¶ 4 and 13.

| STATEMENT | OBJECTION | RULING |
|---|---|---|
| 1. **Francis MSJ Declaration, Page 2, ¶ 3** ("GGW Global Brands, Inc. (formerly known as GGW Brands, Inc.) has been the sole Member of GGW Marketing, LLC since the date of the creation of GGW Marketing, LLC in 2006. . . . The owners of GGW Global Brands, Inc. have been Kaafu Technologies, LLC (2013) and Aero Falcons, LLC (2006–2012)."). | Sham Affidavit Rule; contradicts Francis's 4/18/12 Deposition. | Sustained. |
| 2. **Francis MSJ Declaration, Exhibit B** (Unsigned letter from Michael Kerry Burke stating, *inter alia*, that "GGW Brands, Inc. is the 100% owner of GGW Marketing, LLC"). | Hearsay, Fed.R.Evid. 802. | Sustained. |
| 3. **Francis MSJ Declaration, Page 3, ¶ 5** ("I have been the Manager of GGW Marketing, LLC since the date of its formation in 2006."). | Sham Affidavit Rule; contradicts Francis's 4/18/12 Deposition. | Sustained. |
| 4. **Francis MSJ Declaration, Page 3, ¶ 6** ("GGW Brands, LLC was never a Manager nor was it ever a Member of GGW Marketing, LLC"). | Sham Affidavit Rule; contradicts Francis's 4/18/12 Deposition. | Sustained. |
| 5. **Francis MSJ Declaration, Page 3, ¶ 9** ("At the time of the cancellation of GGW Marketing, LLC in Delaware and California in 2012, GGW Marketing, LLC was not involved in the distribution of adult entertainment content."). | Sham Affidavit Rule; contradicts Francis's 4/18/12 Deposition. | Sustained. |
| 6. **Francis MSJ Declaration, Pages 3–4, ¶ 11** ("The business of GGW Marketing, LLC which began four years prior to the creation of the Debtors, was never commingled with the businesses of the Debtors, never operated as a single business with the Debtors, and GGW Marketing, LLC kept books and records separate and distinct from the Debtors."). | Sham Affidavit Rule; contradicts Francis's 4/18/12 Deposition. Conclusory. Statement utterly discredited by the record. | Sustained. |
| 7. **Francis MSJ Declaration, Page 4, ¶ 12** ("In November, 2011, as Manager of GGW Marketing, LLC, I executed an assignment of intellectual property owned by GGW Marketing, LLC to Path Media Holdings, LLC. This was merely a mechanism to facilitate all intellectual property, both domestic and international, being held by one entity."). | Sham Affidavit Rule; contradicts Francis's 4/18/12 Deposition. Statement utterly discredited by the record. Conclusory statement. | Sustained. |
| 8. **Francis MSJ Declaration, Page 4, ¶ 12** ("[The transfer of the Trademarks to Path Media] was not done with the intent to hinder, delay or defraud creditors of GGW Marketing, LLC") | Sham Affidavit Rule; contradicts Francis's 4/18/12 Deposition. Statement utterly discredited by the record. Conclusory statement. | Sustained. |
| 9. **Francis MSJ Declaration, Page 4, ¶ 12** ("GGW Marketing was not insolvent at the time [of the | Hearsay, Fed.R.Evid. 802. Sham Affidavit | Sustained.[36] |

**36.** Argyle contends that this statement is not hearsay because it goes to Francis's state of

transfer of the Trademarks to Path Media] or rendered insolvent by the transfer. Indeed, I had been advised by counsel representing GGW Marketing, LLC that GGW Marketing, LLC had no significant exposure in either of two lawsuits then pending against GGW Marketing, LLC. . . .").

Rule; contradicts Francis's 4/18/12 Deposition. Conclusory.

| | | |
|---|---|---|
| **10. Francis MSJ Declaration, Page 4, ¶ 14** ("I am not currently the Manager of Path Media Holdings, LLC. To my knowledge, Asia Trust is the current Manager of Path Media Holdings, LLC and Hammersmith Trust is the sole Member. I am neither the settlor nor a beneficiary of the Hammersmith Trust. I have never controlled Path Media. When I was Manager of Path Media, it was controlled by AsiaTrust on behalf of Ridgewood Global Trust, the Member at the time."). | Sham Affidavit Rule; contradicts Francis's 7/12/13 Deposition. | Sustained. |
| **11. Francis MSJ Declaration, Page 5, ¶ 15** ("From the time of creation of [the Original Debtors] in 2010, to the date of transfer of the trademarks by GGW Marketing, LLC to Path Media Holdings, LLC in November, 2011, the Debtors were permitted by GGW Marketing, LLC, pursuant to an oral intellectual property licensing agreement, to use the intellectual property owned by GGW Marketing, LLC, and licensing fees for such use, at the rate of $150,000 per month, were deferred. This was intended as a temporary arrangement until the Debtors had a chance to get their businesses fully functional and at maximum profitability. It was a voluntary accommodation that could be terminated at any time. As Manager of GGW Marketing, LLC, I had agreed to this because years earlier I had founded the Girls Gone Wild brand and established the trademarks and other intellectual property and I wanted to see the brand continue. It was never intended to be a permanent arrangement or to obligate successor owners of the intellectual property to continue such arrangement."). | Sham Affidavit Rule; contradicts Francis's 4/18/12 Deposition. | Sustained. |
| **12. Francis MSJ Declaration, Page 5, ¶ 16** ("Argyle Online is owned by Hammersmith Trust, of which I am neither settlor nor beneficiary. The manager of Argyle Online is Abbey Wilson. While she and I have a personal relationship, she independently runs Argyle Online and I do not control her or her decisions."). | Sham Affidavit Rule; contradicts Francis's 7/12/13 Deposition. | Sustained. |
| **13. Francis MSJ Declaration, Page 5, ¶ 17** ("Following the Assignments of intellectual property by GGW Marketing, LLC to Path Media, neither I nor Path Media instructed distributors to remit Royalties arising out of or relating to the intellec- | Sham Affidavit Rule; contradicts Francis's 7/12/13 Deposition. | Sustained. |

mind and whether he had an intent to hinder, delay or defraud. REO at 5. The Trustee contends that what Francis believed was irrelevant. Reply Objections at 5. Because the

Court is striking ¶ 12 of the Francis 9/11/13 Decl. in its entirety based on the sham affidavit rule, it is not necessary for the Court to rule on this issue.

tual property to Argyle rather than to the Debtors.").

| | | |
|---|---|---|
| 14. **Francis MSJ Declaration, Page 5, ¶ 19** ("At the time GGW Marketing, LLC transferred the intellectual property to Path Media Holdings, LLC, GGW Marketing, LLC was not engaged or was about to engage in a business or transaction for which the remaining assets of GGW Marketing, LLC were unreasonably small in relation to the business or transaction. At the time GGW Marketing, LLC transferred the intellectual property to Path Media, GGW Marketing, LLC did not intend to incur, or believe or have reason to believe that it would incur, debts beyond the its [sic] ability to pay as they became due."). | Sham Affidavit Rule; contradicts Francis's 4/18/12 Deposition. Conclusory. | Sustained. |
| 15. **Francis MSJ Declaration, Page 6, ¶ 21** ("The url's utilized by [the Original Debtors] were never owned by any of those entities. They were owned by GGW Marketing, LLC and then transferred by GGW Marketing, LLC to Path Media in 2011 when the trademarks were transferred. As part of the oral licensing arrangement between GGW Marketing, LLC and GGW Brands, LLC, maintenance fees for the url's were paid by GGW Brands, LLC, but GGW Brands, LLC was never given title to such url's."). | Sham Affidavit Rule; contradicts Francis's 4/18/12 Deposition. Conclusory. | Sustained. |

## 2. Whether GGW Brands, LLC was a Member, Manager, or Neither of GGW Marketing, LLC

A significant portion of the Opposition focuses on Argyle's argument that GGW Brands, LLC was neither a member nor a manager of GGW Marketing, LLC. Therefore, according to Argyle, the Trustee, on behalf of GGW Brands, LLC, did not have authority to file a bankruptcy on behalf of GGW Marketing, LLC. Opposition at 10–11. This argument is barred by the law of the case doctrine and collateral estoppel.

### a. Law of the Case Doctrine

The law of the case doctrine provides that a "court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case." *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir.1993). Stated alternatively, "a court should not reopen issues decided in earlier stages of the same litigation." *Agostini v. Felton*, 521 U.S. 203, 236, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). "The doctrine is grounded in the need for litigation to come to an end." *Disimone v. Browner*, 121 F.3d 1262, 1266 (9th Cir.1997). For the law of the case doctrine to apply, "the issue in question must have been decided either expressly or by necessary implication in the previous disposition." *Thomas*, 983 F.2d at 154 (internal quotation marks omitted).

Here, it is undisputed that PSL, Argyle, and Francis filed an Opposition to the Revocation Motion, and counsel representing these parties appeared at the 5/20/13 Hearing. During the 5/20/13 Hearing, the Court granted the Revocation Motion, finding that GGW Brands, LLC was a member of GGW Marketing, LLC. Alternatively, the Court found that even if

GGW Brands, LLC were only the manager of GGW Marketing, LLC, it would still have authority to revoke GGW Marketing, LLC's cancellation and file a bankruptcy case on its behalf. Trans. 5/20/13 Hearing at 49:8–22. PSL, Argyle, and Francis appealed the Revocation Order and that appeal was dismissed for lack of prosecution.

Further, it is undisputed 1) Path Media is controlled by Francis; 2) Argyle is Path Media's "U.S. Representative;" and 3) Fab Films, LLC is the alleged successor of Argyle. It follows that Path Media and Fab Films, LLC were adequately represented during the hearing on the Revocation Motion. Therefore, the Court finds that the law of the case doctrine bars any argument that GGW Brands, LLC did not have the authority to revoke the cancellation of, and file bankruptcy on behalf of, GGW Marketing, LLC.

### b. Collateral Estoppel

■ The Court previously decided that GGW Brands, LLC was a member of GGW Marketing, LLC. Alternatively, the Court determined that even if GGW Brands, LLC were only GGW Marketing, LLC's manager, it would still have authority to file bankruptcy on behalf of GGW Marketing, LLC. Therefore, the federal standard of issue preclusion, which is also referred to as collateral estoppel, applies in this case. *Oyeniran v. Holder,* 672 F.3d 800, 806 (9th Cir.2012) (noting that collateral estoppel is the same as issue preclusion); *McQuillion v. Schwarzenegger,* 369 F.3d 1091, 1096 (9th Cir.2004) ("Where a federal court has decided the earlier case, federal law controls the collateral estoppel analysis."). Pursuant to federal law, four factors must be present for collateral estoppel to apply: 1) the issue at stake was identical to the issue in the previous proceeding; 2) the issue was actually litigated and decided in the prior proceeding; 3) there was a full and fair opportunity to litigate the issue; and 4) the issue was necessary to decide the merits. *Oyeniran,* 672 F.3d at 806.

■ During the 5/20/13 Hearing, after considering the relevant pleadings and providing the Trustee and Francis (defined above as PSL, Argyle, and Francis) an opportunity to be heard, the Court expressly found that: 1) GGW Brands, LLC was a member of GGW Marketing, LLC; and 2) even if GGW Brands, LLC were only a manager of GGW Marketing, LLC, it would still have authority to revoke GGW Marketing, LLC's cancellation. The issue whether GGW Brands, LLC was a member of GGW Marketing, LLC is identical to the issue raised in the Opposition,[37] and was previously decided against Francis by the Court.[38] Francis had a full and

---

**37.** *See* Revocation Opposition at 1:

The Motion hinges entirely on a single fact, that is, whether Debtor GGW Brands, LLC was the "member" of GGW Marketing. Because if Debtor GGW Brands, LLC was, in fact, the "member" of GGW Marketing, then it was the underlying owner of the Trademarks. And, if it was the owner of the Trademarks, then GGW Marketing, transfer of the Trademarks to Path could be asserted and conceivably avoided by the Trustee on behalf of the bankruptcy estate of GGW Marketing as fraudulent if the Court permitted the [revocation of the] cancellation of GGW Marketing and the filing

of a voluntary petition. The Motion, however, must fail. Debtor GGW Brands, LLC was never the "member" of GGW Marketing; it was only the "manager", entitling it [sic] no underlying ownership interest in the Trademarks. . . .

**38.** Argyle has taken contrary positions regarding whether GGW Brands, LLC was the manager of GGW Marketing, LLC. In the Revocation Opposition, Francis stated unequivocally that GGW Brands, LLC was the manager of GGW Marketing, LLC. Revocation Opposition at 1. Now, Argyle claims that GGW Brands,

fair opportunity to litigate these issues—the Court considered its Revocation Opposition and "Motion to Strike and Sur–Reply," (Sur–Reply) BK Docket # 151 (even though the Sur–Reply was filed at approximately 7:00 a.m. the morning of the 5/20/13 Hearing) and provided Francis with ample opportunity to be heard. And, the determination that GGW Brands, LLC was the member of GGW Marketing, LLC, (or alternatively, GGW Brands, LLC's authority if it were only the manager of GGW Marketing, LLC) was necessary and essential to the Court's ruling that the Trustee had authority to file bankruptcy on behalf of GGW Marketing, LLC.

 Additionally, for collateral estoppel to apply, the party against whom it is asserted must be "a party or in privity with a party at the first proceeding." *Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 885 (9th Cir.2000). "Privity is a legal conclusion designating a person so identified in interest with a party to former litigation that he represents precisely the same right in respect to the subject matter involved." *United States v. Bhatia*, 545 F.3d 757, 759 (9th Cir.2008) (internal quotation marks omitted). "[A] nonparty may be bound by a judgment because she was adequately represented by someone with the same interests who was party to the suit." *Taylor v. Sturgell*, 553 U.S. 880, 893–95, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008) (internal quotation marks omitted).

Argyle and Francis were both parties in the first proceeding. And, as noted above, because of Path Media and Fab Films,

LLC's relationship with Francis and Argyle, Path Media and Fab Films, LLC's interests were adequately represented during litigation of the Revocation Motion. Accordingly, the Court finds that collateral estoppel also applies in this case and bars Argyle from attempting to relitigate the issue whether the Trustee had the authority to revoke GGW Marketing, LLC's cancellation and file a bankruptcy on its behalf.

**B. Single Business Enterprise**

The Trustee argues that the Debtors should be treated as a single business enterprise for the purpose of determining whether the Assignments and Termination/Re–License are fraudulent transfers. MSJ at 13–14.[39] In contrast, Argyle vehemently denies that GGW Marketing, LLC operated as a single business enterprise with the Original GGW Debtors. Opposition at 6.

 California law recognizes the "single business enterprise" doctrine. *Toho–Towa Co., Ltd. v. Morgan Creek Prods., Inc.*, 217 Cal.App.4th 1096, 159 Cal. Rptr.3d 469, 480 (2013). This equitable doctrine is "applied to reflect partnership-type liability principles when corporations integrate their resources and operations to achieve a common business purpose." *Id.* Specifically, this doctrine allows a court to "disregard the corporate form in order to hold one corporation liable for the debts of another affiliated corporation when the latter is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality, agency, con-

LLC was never the manager of GGW Marketing, LLC. Opposition at 5.

**39.** In the MSJ, the Trustee indicated that he "intends to move for substantive consolidation of the Debtors' estates" and therefore, it might not be necessary for the Court to rule on the single business enterprise theory. MSJ at 17. A review of the BK Docket reveals that as of 9/19/13, no motion for substantive consolidation had been filed. Therefore, the Court believes it is appropriate to determine whether the single business enterprise theory applies in this case.

duit, or adjunct of another corporation." *Id.* at 479 (internal quotation marks omitted) (citing *Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*, 235 Cal.App.3d 1220, 1 Cal.Rptr.2d 301, 317 (1991)).

The party seeking a determination that two or more corporations are a "single enterprise" must demonstrate that there is: 1) "such a unity of interest and ownership that the separate corporate personalities are merged, so that one corporation is a mere adjunct of another or the two companies form a single enterprise," and 2) "an inequitable result if the acts in question are treated as those of one corporation alone." *Tran v. Farmers Group, Inc.*, 104 Cal.App.4th 1202, 128 Cal.Rptr.2d 728, 740 (2002). Courts can consider several factors when making this determination, including: 1) the commingling of funds and assets of the entities, 2) the treatment by an individual of the assets of the entities as his own, 3) identical equitable ownership in the entities, employment of the same employees and/or attorney, and 4) the diversion of assets from the entity to another entity to the detriment of creditors. *Greenspan v. LADT LLC*, 191 Cal.App.4th 486, 121 Cal.Rptr.3d 118, 138–39 (2010); *Troyk v. Farmers Group. Inc.*, 171 Cal.App.4th 1305, 90 Cal.Rptr.3d 589, 619 (2009). "No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine." *Greenspan*, 121 Cal.Rptr.3d at 139.

The Trustee argues and Argyle agrees that the Original GGW Debtors acted as a single enterprise. Therefore, the only remaining question is whether GGW Marketing, LLC was part of this enterprise. Here the undisputed facts demonstrate that all the Debtors, including GGW Marketing, LLC, operated as a single business enterprise.

Although the Trademarks were originally owned by GGW Brands, LLC and GGW Marketing, LLC, all of the Debtors used the Trademarks. Even after the Assignments, the Debtors continued to use and pay the registration fees for the Trademarks. Further, Path Media addressed the Termination Notice to each of the Debtors and collectively referred to "GGW Brands, LLC, GGW Direct, LLC, GGW Events, LLC, GGW Magazine, LLC and GGW Marketing, LLC" as the "GGW Entities." Heyn 5/23/13 Decl. ¶ 13, Ex. J. In the Termination Notice, Path Media did not draw any distinctions between the Debtors regarding their prior use of the Trademarks. Further, Argyle does not dispute that all of the Debtors, including GGW Marketing, LLC, used the Trademarks as part of "their adult entertainment business enterprise." SS ¶ 16; SGI ¶ 16 (undisputed). Therefore, Path Media and Argyle treated all of the Debtors, including GGW Marketing, LLC as a single business enterprise. There is no reason for the Court to disregard Path Media and Argyle's treatment of all of the Debtors as a single business enterprise for purposes of adjudicating the MSJ.

Moreover, Francis exercised complete control and decision making authority over all of the Debtors, including hiring and firing Debtors' employees, negotiating with vendors on behalf of all the Debtors, and determining how much he would be paid. At least as of 5/15/12, he was listed at top of the GGW Org Chart, demonstrating that even though his title was "Creative Consultant," he was at the helm of the GGW Entities and all employees reported to him. Even after Dale was appointed as the manager of Pablo Holdings, Francis continued to control the GGW Entities, which is evidenced by his utilizing the GGW Direct, LLC bank account to transfer money from Argyle to Kiki on the date

that the Original GGW Debtors filed bankruptcy. And, until the Trustee was appointed, Francis, through his control of Path Media and the Trademarks, controlled the Debtors.

Tym represented Francis and all of the Debtors at the time of the Termination/Re–License. Further, on 8/10/12, three months after GGW Marketing, LLC's purported cancellation in Delaware, GGW Brands, LLC, GGW Marketing, LLC, and other entities, who were represented by the same lawyer, filed a "Defendants' Response to Plaintiff Etagz, Inc.'s Surreply in Opposition to Defendants' Motion to Dismiss Third Amended Complaint" in *Etagz, Inc. v. Conrey Publications, Inc., et al.,* Case No. 2:10–cv–01266, in the District of Utah. Heyn 5/9/13 Decl. ¶ 19, Ex. O.

To support its position that GGW Marketing, LLC did not operate as a single business enterprise with the Original GGW Debtors, the Opposition cites to the Declaration of Christopher Dale, who states he never had business dealings with GGW Marketing, LLC during his time as manager of GGW Brands, LLC. Dale 9/11/13 Decl. ¶ 6.[40] Accepting this fact to be true, it does not change the analysis. It is undisputed that Dale was the manager of GGW Brands, LLC for a short period of time: from late October/early November 2012 to April 2013. During that period of time, it is questionable whether GGW Marketing, LLC was in existence because GGW Marketing, LLC was cancelled in Delaware

approximately six months before Dale's promotion. Even if GGW Marketing, LLC were still in existence after its cancellation in Delaware, Dale signed the California Certificate of Cancellation for GGW Marketing, LLC a few months after receiving his promotion. He also worked only about 4 to 5 hours per week for the GGW Entities while he also worked full-time for an unrelated entity as a human resources manager. Therefore, Dale's knowledge of the interactions between GGW Marketing, LLC and the Original GGW Debtors is extremely limited. Based on the record and Dale's statement alone, no reasonable trier of fact could conclude GGW Marketing, LLC did not operate as a single business enterprise with the Original GGW Debtors. *See Scott,* 550 U.S. at 380, 127 S.Ct. 1769.

Second, the undisputed facts show there would be an inequitable result if: 1) the Assignments are attributed solely to GGW Marketing, LLC and GGW Brands, LLC; and 2) the Termination/Re–License is attributed solely to GGW Direct, LLC. "It would be unjust to permit those who control companies to treat them as a single or unitary enterprise and then assert their corporate separateness in order to commit frauds and other misdeeds." *Las Palmas,* 1 Cal.Rptr.2d at 317. Several lawsuits were threatened or pending against the Debtors (individually and collectively) at the time of the Assignments and Termination/Re–License. Klueger formed Path Media for the purpose of shielding Francis's and the GGW Entities' assets from

---

**40.** The Opposition also cites Arthur Greenfield's (Greenfield) declaration in which he states that "[d]uring my tenure as Chief Financial Officer for both Mantra Films, Inc. and GGW Marketing, LLC the two entities were not run as a single business enterprise but rather kept separate records, and books and accounts, and had separate distinct business missions." Greenfield 9/11/13 Decl. ¶ 4.

As an initial matter, Greenfield does not provide any information regarding when he was the CFO of Mantra and GGW Marketing, LLC. Further, Mantra Films, Inc. is not a party to this adversary proceeding, involved in the bankruptcy case, or alleged by the Trustee to be part of the single business enterprise. Accordingly, this fact is not material.

creditors. The Court finds that the Debtors' creditors would be harmed if the Assignments and Termination/Re–License were not attributed to the Debtors collectively. The complex corporate structure created by Klueger was intended to keep the GGW Entities' assets away from creditors. And, as a result of the Assignments and Termination/Re–License, when the Debtors filed bankruptcy, their estates were essentially eviscerated.

### C. Adverse Inference

The Trustee next argues that this Court should consider Argyle's "continued failure to respond to discovery" and Francis's "willful destruction of emails and electronic records" in determining whether the Assignments and Termination/Re–License are fraudulent transfers. MSJ at 14–15. Argyle does not address the Trustee's request that the Court draw an adverse inference from Argyle's failure to comply with its discovery obligations. Argyle does, however, contend that Francis "never instructed employees to destroy or delete files of the Debtors." SGI ¶ 83.

### 1. Failure to Respond to Discovery

■■■■ 11 U.S.C. § 105(a) allows a court to "tak[e] any action or [make] any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." Where a party has breached a discovery obligation by failing to produce evidence, a court has "broad discretion in fashioning an appropriate sanction." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir.2002); *accord In re Rimsat, Ltd.*, 212 F.3d 1039, 1047 (7th Cir.2000); *In re Eddy*, 339 B.R. 8, 14 (Bankr.D.Mass.2006). A party can seek an adverse inference instruction on "the basis that the evidence was not produced...." *Residential Funding Corp.*,

306 F.3d at 107. A party seeking an adverse inference based on a failure to respond to discovery must show that: 1) "the party with control over the evidence had an obligation to timely produce it;" 2) "the party that failed to timely produce the evidence had 'a culpable state of mind;'" and 3) "the missing evidence is 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Id.; accord In re Napster, Inc. Copyright Litigation*, 462 F.Supp.2d 1060, 1078 (N.D.Cal. 2006). Where evidence is not provided through gross negligence or bad faith, the state of mind of the non-responding party is sufficient to draw an adverse inference that the missing evidence is unfavorable to that party. *Residential Funding Corp.*, 306 F.3d at 108–09.

■■■ On 5/31/13, the Trustee served Argyle with the Discovery Requests but as of 8/22/13, the Trustee had not received any response to those requests. Pfister 8/22/13 Decl. ¶ 17. Therefore, the Trustee seeks an adverse inference against Argyle based on its failure to respond to Interrogatory Nos. 4 and 14. Interrogatory No. 4 seeks information regarding "the circumstances (including when, how, who was involved, and what consideration, if any, was exchanged) by which Path Media acquired title to the Trademarks." Pfister 8/22/13 Decl. ¶ 4, Ex. A. Interrogatory No. 14 seeks information concerning "all business or commercial activities in which [Argyle is] currently engaged or in which [Argyle has been] engaged during this calendar year 2013...." *Id.* The Trustee asserts that failure to respond to these requests should lead to an inference that Path Media and Argyle had no legitimate business operations other than replacing the Debtors as the entities through which Girls Gone Wild is operated.

It is undisputed that Argyle was served with the Discovery Requests and had control over answering the interrogatories and requests for production. Further, given Argyle's relationship with Path Media, as its "U.S. Representative," and Francis's control over both Argyle and Path Media, Argyle also had control over the information sought concerning Path Media. Argyle had an obligation to produce the evidence requested within 30 days. FRBP 7033 and 7034; FRCP 33(b)(2) and 34(b)(2)(A) (requiring responses to interrogatories and requests for production within 30 days of service).

It is also undisputed that Argyle failed to timely produce the evidence with a culpable state of mind. After Butler withdrew from representing Argyle on 7/22/13, the Trustee's counsel contacted Kolodzi, Argyle's new counsel regarding the Discovery Requests. Pfister 8/22/13 Decl. ¶¶ 11–14, Ex. B. Kolodzi agreed to provide responses to the Discovery Requests by 8/16/13 but never did. *Id.* These facts demonstrate that the failure to respond rises above mere negligence. Argyle knew of the Discovery Requests, agreed to provide responses, but failed to do so. Accordingly, Argyle was grossly negligent in failing to respond to the Discovery Requests.

Finally, the interrogatories themselves, and the circumstances surrounding the failure to respond, establish that the Discovery Requests are relevant to the Trustee's fraudulent transfer claims. Therefore, the requirements for drawing an adverse inference are met and this Court finds that Path Media and Argyle had no legitimate business operations other than replacing the Debtors as the entities through which Girls Gone Wild Franchise is operated. *Id.* at 107 (holding that a court has "broad discretion in fashioning an appropriate sanction" for

breaching a discovery obligation); *In re Rimsat, Ltd.,* 212 F.3d at 1047 (upholding sanctions against attorneys for conduct during depositions and for delaying compromise hearing); *In re Eddy,* 339 B.R. at 14 (upholding entry of default judgment for failure to comply with discovery timeline).

### 2. Destruction of Evidence

The Trustee seeks an adverse inference based on Francis's destruction of the Debtors' e-mails and legal records. MSJ at 14–15. According to the Trustee, on 3/22/13, after Wynn LV filed the Motion for Trustee, Francis called several of Debtors' employees into a meeting in his office. During that meeting, Francis told employees to "go through the Debtors' electronic files and delete email messages and legal records." MSJ at 11. At Francis's direction, Debtors' employees were given new email accounts ending in "@argyleonline.com." MSJ at 11; SS ¶ 84; SGI ¶ 84 (undisputed). The Trustee contends that this indicated that Argyle "had already been selected by Francis as the replacement legal entity" to operate the Franchise. MSJ at 11.

In the Opposition, Argyle does not address or argue that the Court should not draw an adverse inference from the destruction of documents. Instead, in the SGI, Argyle claims that this fact is disputed and relies on one sentence in the Francis 9/11/13 Decl., which states that "I have never instructed employees of the Debtors to destroy or delete files of the Debtors." Francis 9/11/13 Decl. ¶ 18.

As previously noted, credibility determinations and the weighing of the evidence are not appropriate when "ruling on a motion for summary judgment." *Rezner v. Bayerische Hypo–Und Vereinsbank AG,* 630 F.3d 866, 871 (9th Cir.2010) (quoting *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505). Here, Argyle challenges the Trustee's as-

sertion that Francis directed the destruction of evidence and submits the Francis 9/11/13 Decl. to support its position. Viewing the facts in the "light most favorable to" Argyle, as the Court must when adjudicating the MSJ, *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Court cannot not draw an adverse inference regarding the destruction of evidence.

### D. 11 U.S.C. § 548(a)(1)

The Trustee moves for summary judgment regarding Counts 1 through 8 of the FACC. MSJ at 3. Counts 1 through 4 seek avoidance and recovery of the Assignments.[41] Counts 5 through 8 seek avoidance of the Termination/Re–License and recovery of the Fee.[42]

Pursuant to 11 U.S.C. § 548(a), the Trustee "may avoid any transfer . . . of the debtor in property . . . that was made or incurred . . . within 2 years" if the transfer was made with (A) actual intent to hinder, delay, or defraud creditors or (B) if the debtor received less than reasonably equivalent value and was insolvent because of the transfer.

#### 1. The Assignments—Counts 1 through 4

##### a. Debtors' Property

■ Title 11, United States Code, § 541(a)(1) defines property of the estate broadly, as "all legal or equitable interests of the debtor in property as of the commencement of the case." Property of the debtor means property that would have been part of the debtor's estate had it not been transferred before commencement of the bankruptcy proceedings. *Begier v. I.R.S.*, 496 U.S. 53, 59, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990). It is undisputed that the Trademarks are property and that GGW Brands, LLC and GGW Marketing, LLC owned the Trademarks before 11/15/11. Cal. Civ.Code § 655 (West 2013) (stating trademarks are property); *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) ("Property interests are created and defined by state law."). And, as analyzed above, because the Debtors operated as a single business enterprise, the Trademarks were also the property of all the GGW Entities.

##### b. Transfer

Title 11, United States Code, § 101(54)(D) defines a transfer as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with (i) property; or (ii) an interest in property." The Assignments were made by GGW Marketing, LLC and GGW Brands, LLC and disposed of all of the Debtors' interest in the Trademarks. Accordingly, the Assignments are transfers under § 548(a)(1).

##### c. Two Years

The Assignments occurred on 11/15/11. The Original GGW Debtors filed bankruptcy on 2/27/13. The Trustee filed a bankruptcy on behalf of GGW Marketing, LLC on 5/22/13. Therefore, the Assignments

---

**41.** Counts 1 and 2 allege actual intent fraudulent transfer under 11 U.S.C. § 548(a)(1)(A) on behalf of all the Debtors and GGW Brands, LLC and GGW Marketing, LLC, respectively. And, counts 3 and 4 allege constructive fraudulent transfer under 11 U.S.C. § 548(a)(1)(B) on behalf of all the Debtors and GGW Brands, LLC and GGW Marketing, LLC, respectively.

**42.** Counts 5 and 6 allege actual intent fraudulent transfer under 11 U.S.C. § 548(a)(1)(A) on behalf of all the Debtors and GGW Direct, LLC, respectively. And, counts 7 and 8 allege constructive fraudulent transfer under 11 U.S.C. § 548(a)(1)(B) on behalf of all the Debtors and GGW Direct, LLC, respectively.

were made within two years of the date the Debtors filed bankruptcy.

### d. Counts 1 and 2—11 U.S.C. § 548(a)(1)(A)

To prevail on the § 548(a)(1)(A) claims (actual intent fraudulent transfer), the Trustee must prove the Debtors made the Assignments with actual intent to hinder, delay, or defraud the Debtors' creditors. The Trustee argues that the Retention Letter and Klueger's testimony, the pending and threatened lawsuits, the importance of the Trademarks to the Debtors' business, Francis's relationship with the Debtors, and the Debtors' continued use of the Trademarks after the Assignments support his § 548(a)(1)(A) claims. Argyle counters that the Assignments were made to facilitate all IP being held in one entity and that it was not done with the intent to hinder, delay or defraud.

The Debtors' business depends on the ability to use the Trademarks. Notwithstanding that fact, the Debtors transferred the Trademarks to Path Media for no consideration. As indicated in the Retention Letter, Klueger formed Path Media for the purpose of "acting as the holder of [Francis's] IP, including, copyrights, trademarks, URL's, scripts, source codes, etc." And, other "offshore entity or entities" would act as "holding companies" to "insulate" Francis's ownership. The Retention Letter also indicated that a "foreign trust" would be formed in a "jurisdiction that is friendly to you and hostile to your creditors," and that the "foreign trust will own the offshore entities." Although Klueger testified under oath that he did no work on behalf of Francis for tax planning purposes, the Retention Letter states, "we will assure that any and all corporate reorganizations that we undertake is explainable by you as legitimate corporate planning and legal tax plan-

ning." Klueger acknowledged that he formed Path Media in Nevis because that made it "[j]ust more difficult for a creditor to be able to access the assets." Therefore, it is beyond dispute that Path was created to shield the GGW Entities' assets from creditors.

Even after transferring the Trademarks to Path Media, the Debtors continued using the Trademarks just as they had before the Assignments. Francis controlled and was the beneficial owner of Path Media. Until late October/early November 2012, Francis also managed Pablo Holdings, which controlled the Debtors.

When the Assignments occurred, two lawsuits had been filed and two lawsuits were threatened against the GGW Entities. Francis's control of the GGW Entities, through his ownership of Path Media and management of Pablo Holdings, the proximity of the Assignments with the actual litigation, the Debtors' continued use of the Trademarks after the Assignments, and Klueger's acknowledgement that he formed Path Media to make it more difficult for a creditor to access and seize the IP demonstrate that Francis intended the GGW Entities to continue operating the Franchise while the GGW Entities only real asset—the Trademarks—were held in the name of another entity.

Six months after the Assignments, Francis and Klueger cancelled GGW Marketing, LLC's certification of formation in Delaware, indicating they did not wish to leave in existence the entity that transferred the Trademarks to Path Media. The act of cancelling GGW Marketing, LLC, in conjunction with Klueger's testimony that he formed Path Media so that no creditor could "seize the intellectual property," demonstrates that Klueger and Francis sought to ensure the Trademarks could not easily revert back to the trans-

feror, GGW Marketing, LLC.[43] From these facts, the Court must conclude that the purpose of the Assignments was to make it much more difficult, costly, and time-consuming for creditors to reach the Trademarks.

Further, the circumstances surrounding the Assignments prove the Debtors assigned the Trademarks with the intent to hinder, delay, or defraud creditors. The Debtors were named as defendants in two lawsuits and were threatened with additional lawsuits when the Assignments occurred. The Debtors transferred the Trademarks—which were essential to the Franchise's operation—to Path Media for no consideration. Although there is insufficient direct evidence in the record demonstrating that on 11/15/11, Debtors were insolvent or became insolvent as a result of the Assignments, it is reasonable to assume this is true because the Trademarks were essential to the operation of the Debtors' business—without the Trademarks, the Debtors could not generate revenue. The Trademarks were the Debtors' most important and valuable asset, and the transfer of the Trademarks would undoubtedly lead to insolvency.[44] The "confluence" of several of these circumstances can constitute conclusive evidence of actual intent to defraud. *In re Acequia, Inc.*, 34 F.3d 800, 805–06 (9th Cir.1994).

Additionally, it is beyond dispute that there was a special relationship between the Debtors and Path Media. Francis controlled both the Debtors and Path Media. Klueger formed Path Media for the purpose of shielding Francis's and the Debtors' assets from creditors. Path Media was owned by Ridgewood, and Francis is a principal and a beneficiary of Ridgewood. Finally, after the Assignments, the Debtors continued to use the Trademarks without paying any fees or royalties to Path Media. The Debtors also maintained the Trademarks by paying registration fees and making payments to attorneys for Path Media regarding the Trademarks. This use continued for more than a year-and-a-half, until 2/25/13 or 2/26/13, when the Termination Notice was sent to the Debtors one or two days before the Original GGW Debtors filed bankruptcy.

### e. Counts 3 and 4—11 U.S.C. § 548(a)(1)(B)

To prevail under § 548(a)(1)(B) (constructive fraudulent transfer), the Trustee must prove that the Debtors received less than reasonably equivalent value in exchange for the Trademarks, and were insolvent. Because the Debtors did not receive any consideration for the Assignments, it is undisputed that the Debtors received less than reasonably equivalent value in exchange for the Trademarks.

The Trustee argues the Assignments left the Debtors insolvent under § 548(a)(1)(B)(ii)(I) because the Debtors all faced "massive litigation exposure" and lost their "most important asset" as a result of the Assignments. MSJ at 24. Sec-

---

43. At the time of the Assignments, GGW Brands, LLC owned one of the Trademarks at issue and GGW Marketing, LLC owned the remainder of the Trademarks. *Compare* FACC ¶ 11 *with* Heyn 5/23/13 Decl. ¶ 10, Ex. G.

44. As discussed below, the Trustee has not provided evidence demonstrating the Debtors were insolvent at the time of, or as a result of, the Assignments under §§ 101(32)(A) and 548(a)(1)(B). Because § 548(a)(1)(A), however, is concerned with the Debtors' "actual intent" to hinder, delay, or defraud creditors, the Court considers the transfer of the Trademarks and the importance of the Trademarks to the Debtors' business in determining the financial condition of the Debtors at the time of, and as a result of, the Assignments as one of the badges of fraud.

tion 101(32)(A) defines insolvency as the "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation. . . ." The Trustee has not provided evidence, nor is this Court aware of evidence, valuing the litigation exposure or the Debtors' other assets on 11/15/11, when the Assignments occurred. Without this evidence, this Court cannot determine whether Debtors were insolvent at the time of, or as a result of, the Assignments. Accordingly, the Trustee has not shown that the Debtors were insolvent at the time of the Assignments or became insolvent as a result of the Assignments under § 548(a)(1)(B)(ii)(I).

The Trustee next asserts that the Assignments left the Debtors with unreasonably small capital to engage in business or a transaction, under § 548(a)(1)(B)(ii)(II), because the Debtors faced "massive litigation exposure" and by transferring their "most important asset," the Debtors could have that asset "pulled away . . . for any reason or for no reason at all." MSJ at 24. There is no evidence in the record, however, demonstrating what the value of the Debtors' remaining capital was after the Assignments. Without this evidence, the Court cannot determine whether the remaining capital was "unreasonably small."

Last, the Trustee argues as a result of the Assignments, the Debtors intended to incur, or believed that they would incur, debts that would be beyond the Debtors' ability to pay as the debts matured under § 548(a)(1)(B)(ii)(III), because the Debtors "were reduced to operating at the sufferance of Path Media" and could not be "genuinely solvent" if their right to use intellectual property essential to their business could be terminated at any time "for no reason at all." MSJ at 24. The Trustee has not demonstrated that as a result of the Assignments, the Debtors intended to incur debts beyond their ability to pay. The Trustee notes the Debtors faced "massive litigation exposure" but does not provide evidence quantifying the litigation exposure or the amount of the Debtors' assets at the time of the Assignments. Without such evidence, the Court cannot determine whether the debts the Debtors believed they would incur were beyond the Debtors' ability to pay.

The Trustee relies on Francis's statement made during the 2004 Exam that "GGW Marketing didn't have any assets at the time it was closed or canceled," to demonstrate that GGW Marketing, LLC was insolvent at the time of, or as a result of, the Assignments. Reply at 11. As discussed above, the Court finds that much of the Francis 9/11/13 Decl. falls within the purview of the "sham affidavit rule" regarding Francis's knowledge of, and involvement with, GGW Marketing, LLC. Francis's statement made during the 2004 Exam also concerns his familiarity with the business of the GGW Marketing, LLC. It would not be appropriate to allow the Trustee to use Francis's statements as a sword and a shield: to rely on Francis's knowledge of GGW Marketing, LLC's financial position to support the Trustee's position regarding insolvency while at the same time, asking the Court to find that the vast majority of Francis's 9/11/13 Decl. should be stricken as a sham based on his 4/18/12 deposition testimony that he had never heard of, and did not do any work for, GGW Marketing, LLC.

Even if, however, this Court were to consider Francis's statement made during the 2004 Exam, that GGW Marketing, LLC did not have any assets at the time it was closed or cancelled, it would not alter the analysis. As noted previously, GGW Marketing, LLC was cancelled on 5/4/12 in Delaware and on 1/16/13 in California.

The Assignments occurred on 11/15/11. Therefore, even if the Court were to consider Francis's 2004 Exam statement, there would still not be sufficient evidence demonstrating insolvency in November 2011, on the date of the Assignments.

2. The Termination/Re–License—Counts 5 through 8

a. Debtors' Property

 It is beyond dispute that the Fee that was paid as part of the Termination/Re–License was property of GGW Direct, LLC.[45] Under 11 U.S.C. § 541(a)(1)'s broad definition of "property," Debtors' unrestricted use of the Trademarks between November 2011 and February 2013 is also an interest of the Debtors in property. Further, as discussed above, the GGW Entities were part of a single business enterprise, and therefore, all of the Debtors held a property interest in the Fee and the unrestricted use of the Trademarks.

b. Transfer

GGW Direct, LLC paid Argyle $274,250.52 in three separate payments in February 2013 for use of the Trademarks through 5/31/13.[46] These payments disposed of GGW Direct, LLC's property interest in the Fee and therefore, were a transfer under 11 U.S.C. § 101(54)(D). Further, as a result of the integrated Termination/Re–License, the Debtors lost their previously unrestricted right to use the Trademarks, which, at the very least, was a significant prepetition contractual modification. This modification is also a transfer under 11 U.S.C. § 101(54)(D). *In re Brobeck, Phleger & Harrison LLP*, 408 B.R. at 338. Because the Debtors operated as a single business enterprise, payment of the Fee and the termination of their previously unlimited use of the Trademarks was a transfer made by all the Debtors.

c. Two Years

The Termination/Re–License is dated 2/25/13, although as noted above, there is an issue regarding when it was actually executed. The Original GGW Debtors filed bankruptcy on 2/27/13 and GGW Marketing, LLC filed bankruptcy on 5/22/13. Therefore, the Termination/Re–License was made within two years of the date that all Debtors filed for bankruptcy.

d. Counts 5 and 6—11 U.S.C. § 548(a)(1)(A)

 To prevail on the § 548(a)(1)(A) claims, the Trustee must prove the Debtors entered into the Termination/Re–Li-

---

45. The Opposition argues the Termination/Re–License is not a fraudulent transfer because the Debtor's had no property interest in the Trademarks because of the OLA. Opposition at 15–16. This argument lacks merit. First, the only evidence of the purported OLA is contained in ¶ 15 of the Francis 9/11/13 Decl., which as noted above, the Court is not considering based on a finding it falls within the sham affidavit rule. Second, even if the Court were to consider Francis's statement regarding the OLA, it would not change the result. Francis stated that the OLA was only between the Original GGW Debtors and GGW Marketing, LLC and was not intended to bind future owners of the Trademarks. Accordingly, the Debtors use of the Trademarks after the Assignments could not have been pursuant to the OLA. Further, whether or not an OLA existed, rights under a contract are property interests, and modifications of such contracts are avoidable as fraudulent transfers. *See e.g., Greenspan v. Orrick, Herrington & Sutcliffe LLP (In re Brobeck, Phleger & Harrison LLP)*, 408 B.R. 318, 338–39 (Bankr. N.D.Cal.2009).

46. There is no dispute the payments were made under the License Agreement. In GGW Direct, LLC's SoFA, all three payments are titled "Transfer from Direct to Argyle Online for License Fees."

cense with actual intent to hinder, delay, or defraud the Debtors' creditors.

Tym's deposition testimony supports the Trustee's § 548(a)(1)(A) claims. Tym stated the purpose of the Termination/Re–License was for Asiaciti Trust, the trustee for Path Media, through its U.S. Representative, to see "what life was like dealing with somebody in bankruptcy" and that he did not "want to tie [the intellectual property] up in the bankruptcy." Moreover, Tym told Francis on 2/26/13, "the IP license agreement will not be between Path Media and Pablo because we do not want the GGW entities to have access to those licenses" and "I have had Path Media (AsiaCiti) terminate all licenses that were held by [sic] GGW entities." In the Termination Notice, Path Media referred to all of the Debtors collectively as the "GGW Entities."

Tym's 2/26/13 email to Francis also substantiates the Trustee's § 548(a)(1)(A) claims. In that email, Tym expressed concern that the "switchover" might not be completed before the Original GGW Debtors filed bankruptcy and he stated he did not understand why certain people could not "understand that the business is staying the same, and GGW is not really shutting down, it is just that a significant portion of the business is going to Argyle for corporate restructuring purposes."

Combined, Tym's statements made during his deposition and his email to Francis make clear that the Termination/Re–License did not change the way the Debtors did business. Rather, he sought to ensure the GGW Entities held no interest in the IP when they filed bankruptcy.

Further, the circumstances surrounding the Termination/Re–License demonstrate that the Debtors intended to hinder, delay, or defraud creditors at the time of the Termination/Re–License. *In re Acequia, Inc.*, 34 F.3d 800, 805–06 (9th Cir.1994). The Debtors faced five pending lawsuits and nearly emptied their bank accounts on the eve of filing bankruptcy by paying Argyle, an entity controlled by Francis, almost all of the Debtors' cash. Further, the Debtors made the bulk of these payments a week before the Termination/Re–License was executed, showing that the Debtors planned to deplete their bank accounts before filing bankruptcy. After the Fee was paid, the Original GGW Debtors had $1,963 in their bank accounts and on the date that they filed their schedules, they had combined assets of $7,211,878.96 and combined liabilities of $66,190,850.61. The Fee was paid to Argyle, the "U.S. Representative" of Path Media. As stated above, Francis owned and controlled Path Media. And, until the Trustee was appointed, Francis, through his control of Path Media and the Trademarks, also controlled the Debtors. Further, after paying the Fee, the Debtors continued to use the Trademarks the same as they had before the Termination/Re–License. Therefore, the circumstances indicate the Debtors entered into the Termination/Re–License with the intent to hinder, delay, or defraud creditors.

e. Counts 7 and 8–11 U.S.C. § 548(a)(1)(B)

To prevail under § 548(a)(1)(B) (constructive fraudulent transfer), the Trustee must prove that the Debtors received less than reasonably equivalent value for the Termination/Re–License, and were insolvent.

i. Less than Reasonably Equivalent Value

The Trustee first argues that the Debtors received less than reasonably equivalent value in exchange for the Fee because previously, they did not have to pay to use the Trademarks. MSJ at 23.

Argyle counters that pursuant to the OLA, the Original GGW Debtors owed $150,000 per month for use of the Trademarks, but that payment was deferred. Opposition at 15–17. And, Francis claims that based on his experience, the Fee for use of the IP from late February 2013 through 5/31/13 "represented fair use of such intellectual property during that period of time." Francis 9/11/13 Decl. ¶ 20. Although Argyle contends that the Original GGW Debtors owed $150,000 per month for use of the Trademarks, it is undisputed that the after the Assignments, the Debtors continued to use the Trademarks without paying any fee to Path Media.

The bulk or possibly all of $274,250.52 Fee was paid before the date that the Termination/Re–License was executed. Accordingly, GGW Direct, LLC (and as a single business enterprise, the Debtors), could not have received reasonably equivalent value in exchange for the Fee because the Fee purported to pay for use of the Trademarks before the Termination/Re–License was executed. Further, accepting Francis's opinion to be true—that the $274,250.52 Fee was fair value for the use of the IP from late February 2013 to 5/31/13, Francis 9/11/13 Decl. ¶ 20—does not alter the result. As analyzed above, the Termination/Re–License was a single, integrated transaction. As the Trustee notes correctly, although Francis's statement might prove that the Debtors received reasonably equivalent value in exchange for the use of the Trademarks for a three-month period, the Termination/Re–License also terminated the Debtors' previous interest in the free and unrestricted use of the IP. Francis's statement does not prove that the Debtors received reasonably equivalent value in exchange for this contractual modification. Accordingly, the Court finds that the Trustee has demonstrated that GGW Direct, LLC (and all of the Debtors) received less than reasonably equivalent value under § 548(a)(1)(B)(i).

Even if this Court were to consider the Francis 9/11/13 Decl. regarding the OLA, it would not change the result. The Opposition's argument that the $150,000 per month deferred fee under the OLA proves the Fee was reasonably equivalent value for the use of the Trademarks fails. In the Francis 9/11/13 Decl., Francis stated that the OLA between GGW Marketing, LLC and the Debtors was not intended to bind any successors of GGW Marketing, LLC. Francis 9/11/13 Decl. ¶ 15. It follows the OLA did not bind the Debtors' use of the Trademarks after the Assignments.

### ii. Insolvency

■ The Trustee next argues the Termination/Re–License was entered into while the Debtors were insolvent because the Termination/Re–License took place one or two days before the Original GGW Debtors filed bankruptcy and left the Original GGW Debtors with combined assets of $7,211,878.96 and combined liabilities of $66,190,850.61. MSJ at 24.

The undisputed facts demonstrate that the sum of the Debtors' debts far exceeded the sum of the Debtors' property and therefore, the Debtors were insolvent under § 101(32)(A). 11 U.S.C. § 101(32)(A) (defining insolvency as when the sum of an "entity's debts is greater than all of such entity's property, at a fair valuation. . . ."). Further, GGW Direct, LLC listed assets of $3,080,112.96 and liabilities of $17,719,828.91 and GGW Marketing, LLC listed assets of $0 and liabilities of $5,812,588. Accordingly, GGW Direct, LLC and all of the Debtors collectively were insolvent at the time of the Termination/Re–License under § 548(a)(1)(B)(ii)(I).

Alternatively, the Trustee argues the Termination/Re–License was entered into while the Debtors were engaged in a business for which they retained unreasonably small capital. MSJ at 24. Payment of the Fee left the Original GGW Debtors with $1,963 in their bank accounts on 3/13/13, when they filed their bankruptcy schedules. GGW Direct, LLC, the entity that actually made the transfers to Path Media, had no cash on hand as of 3/13/13.[47] Given the scheduled liabilities of the Debtors exceeded $66,000,000, it is beyond dispute that $1,963 is unreasonably small capital to engage in the business of creating and distributing adult entertainment. Accordingly, the Court finds that GGW Direct, LLC and the Debtors collectively were engaged in business at the time of the Termination/Re–License and were left with unreasonably small capital under § 548(a)(1)(B)(ii)(II).

Last, the Trustee argues the Debtors intended to incur, or believed they would incur, debts beyond their ability to pay at the time of the Termination/Re–License. MSJ at 23–24. Specifically, the Trustee contends that the Debtors' total assets and liabilities show "unmanageable indebtedness" and that the Debtors were operating "at the sufferance of Path Media." MSJ at 24. The Trustee is correct that the Debtors' total assets and liabilities demonstrated insolvency and indebtedness. The Debtors' schedules, however, do not, by themselves, demonstrate that the Debtors intended or believed they would incur debts beyond their ability to pay.

It is true that after paying the Fee, the Debtors retained minimal cash. And, to continue using the Trademarks after 5/31/13, they would be required to enter into another license agreement. These facts demonstrate that on the date the Original GGW Debtors filed for bankruptcy, they must have known they would incur additional significant debt—a licensing fee—in approximately three months. But the Debtors continued to operate the Franchise after the Termination/Re–License, and presumably, expected to make money doing so. This money could have been used to pay any future license fee or other debt. Accordingly, without more evidence regarding the amount of money that the Debtors made each month and the amount of any additional licensing fee that would be charged for use of the Trademarks after 5/31/13, this Court cannot find the Debtors intended to incur, or believed they would incur, debts beyond their ability to pay as those debts became due.

## IV. Conclusion

For the reasons stated above, the MSJ is GRANTED as to Counts 1, 2, 5, 6, 7 and 8. The MSJ is DENIED as to Counts 3 and 4. Pursuant to LBR 9021–1(b)(1)(B), movant must serve and lodge a proposed order via LOU within 7 days of the hearing. *Appearances required.*

---

**47.** Although GGW Direct, LLC's schedules indicate that their attorney held $1,846,577.96 in cash—"With Attorney Houston in Las Vegas; property may be subject to state court injunction" GGW Direct, LLC Schedule B, Case No. 13–bk–15132–SK, Docket # 20—this would not alter the analysis given GGW Direct, LLC's $17,719,828.91 in liabilities. *In re GGW Direct, LLC,* 13–15132–SK.